920 A.2d 546

**Robert LOWERY, Jr. et ux.**

v.

**SMITHSBURG EMERGENCY MEDICAL SERVICE et al.**

**No. 344, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

April 5, 2007.

664

Michael P. Coyle, Columbia, for appellant.

Thomas V. McCarron, Baltimore, Steven R. Migdal, Annapolis, for appellee.

Panel DAVIS, EYLER, DEBORAH S. and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

DAVIS, J.

Appellants, Robert R. Lowery, Jr. and Amanda Lowery,[1] appeal from a judgment entered by the Circuit Court for Washington County, Maryland in favor of appellees, Smithsburg Emergency Medical Services (SEMS) and Robert Myerly (Myerly).[2]

This case involves allegations of defamation and intentional interference with economic relations claims. At the close of appellants' case, appellees moved for judgment on all counts and the trial court granted the motion pursuant to Maryland Rule 2–519 on the defamation and intentional interference with economic relations claims. Appellants noted this timely appeal and posit the following issues for our review:

1. Did the trial court err in granting [a]ppellees' Motion in Limine and precluding any testimony whatsoever pertaining to lost wages and benefits for supposed discovery violations?

2. Did the trial court apply the wrong standard of proof with regard to [a]ppellees' motion for judgment pertaining to forfeiture of the conditional privilege afforded employers

---

1. We shall refer to Robert and Amanda Lowery as appellants and Robert Lowery as "appellant" where applicable.

2. We shall refer alternatively to appellees collectively and individually to "SEMS" or to Myerly as "appellee."

for statements made about a former employee's job performance?

3. Did the trial court err in finding there was not sufficient evidence to prove that the conditional privilege afforded statements made about an individual's employment had been forfeited in this case for the matter to be submitted to the jury?

4. Did the trial court err in finding that there was not sufficient evidence to prove that Mr. Myerly acted intentionally and willfully for Mr. Lowery's intentional interference with economic relations claim to be submitted to the jury?

## FACTUAL BACKGROUND

Appellant worked for SEMS from January to July in 2001 as a part-time paramedic. On July 2, 2003, appellant applied to the Federal Bureau of Investigation (FBI) for a job as a Physical Security Specialist (Hazmat) and indicated "Spouse new job" [sic] as the reason for leaving SEMS.

On July 17, 2003, the FBI conditionally offered appellant the position with a GS–11 salary base of $42,976 and additional locality pay provided he passed "a background investigation, preemployment polygraph examination, and urinalysis drug test." Appellant was to be notified if a physical examination was also required. To facilitate the investigation, appellant signed an "Authority to Release Information" form provided by the FBI and the FBI commenced a background investigation. Subsequently, the FBI, by letter dated November 21, 2003, rescinded the conditional offer of employment to appellant because some "information that was developed concerning [appellant's] employment history with [SEMS], indicate[d] that [appellant] may not be suitable for employment with the FBI."

In addition to a SEMS former supervisor and co-worker (e.g. appellee) who failed to recommend appellant to the FBI, the special investigator's report, obtained by appellant from the FBI, listed three references who recommended that appellant be hired and two former supervisors who recommended

against appellant obtaining FBI employment. Another former supervisor and co-worker told the special investigator that appellant expressed dissatisfaction with supervision.

On October 15, 2004, appellant filed a six-count complaint for Defamation, Tortious Interference with a Contract, Tortious Interference with a Prospective Contract, Tortious Interference with an Economic Relationship, Tortious Interference with a Prospective Economic relationship and Loss of Consortium. SEMS and appellee filed their answers on the 12th and 14th of January, 2005, respectively.

Appellant answered appellees' interrogatories on March 24, 2005. Interrogatories numbers six and seven requested that appellant "[s]tate the names and addresses of all experts whom you propose to call as witnesses at the time of trial. . . ." and that he "[i]temize all damages being and/or to be claimed at trial, the amount for each type of damage, the factual basis in support of each itemized damage, the identities of all individuals with such knowledge, and all documents supporting [appellant's] response." Appellant answered interrogatory number six, stating "[appellant has] not yet retained any experts." He answered number seven by stating that he would claim $1.1 million in lost future pay and benefits basing his lost wages "on his current salary of approximately $24,000 per year" that he received as disability income from his job as a firefighter at BWI Airport. Appellant based his calculations as to FBI pay on his conversations with his purported future supervisor at the FBI, Charles Onesko (Onesko).

The trial court established a scheduling order on July 26, 2005 that required all experts be named by August 6, 2005 and all discovery be completed by November 25, 2005.[3] Appellants named Dr. Richard Edelman (Edelman) as an expert to render an opinion in regard to future lost wages on August 5, 2005 and expected to receive information from deposition of Onesko for Edelman's opinion. Appellant was unsuccessful in deposing Onesko and filed a motion to reopen discovery on

---

3. This date was later modified to December 30, 2005.

January 27, 2006, which the trial court denied on February 2, 2006.

As the result of an injury at his job as a firefighter with BWI, appellant received disability payments from the Injured Worker's Insurance Fund (IWIF). At deposition on May 19, 2005, appellant stated that he believed the payments to be "$25,000 a year." On December 13, 2005, appellant received notice that he would receive disability retirement benefits in the amount of $2,353.16 per month for the remainder of his life.

Appellant forwarded to appellees, on March 14, 2006, an IWIF form indicating that he received $562 per week in 2005, the December 13, 2005 notice of disability retirement and a letter from IWIF discontinuing his benefits due to the December disability retirement determination. Appellant sent Edelman's report to appellees the following day.

The court ordered all motions *in limine* to be filed by March 22, 2006 and appellees filed a motion to exclude appellants' expert as having been untimely designated after the time provided therefore in the discovery schedule had expired. The trial court granted the motion on March 23, 2006 and trial commenced on March 27, 2006 and lasted through March 28th. Appellees moved for judgment after the conclusion of appellants' evidence and the motion was granted on March 30, 2006. Appellant filed this timely appeal on April 20, 2006. More facts will be provided as necessary.

## LEGAL ANALYSIS

### MOTION *IN LIMINE*

Appellant initially argues that the trial judge abused his discretion by granting the motion *in limine* to exclude Edelman's report reasoning that, even if the report was filed after the discovery deadline, that, in and of itself, was no basis for excluding the report. The scheduling order, he maintains, required only that "[appellants'] experts shall be designated by August 6, 2005" and Edelman was timely disclosed as an

expert who would perform a lost wages analysis. The order did not require an expert report. Appellant points out that he provided through interrogatories that Edelman would perform the analysis based upon what appellant was then earning through disability and his expected earnings at the FBI. Additionally, the only disclosure outside the discovery period pertaining to appellants' expert was the production of the expert report. At most, therefore, the trial judge should have only excluded it.

In their reply brief, appellants argue that *Food Lion, Inc. v. McNeill,* 393 Md. 715, 904 A.2d 464 (2006), is directly on point with the case at hand. The issue in *Food Lion* was

> whether the testimony of an expert may be excluded at trial on the basis of a disclosure, made during discovery in response to interrogatories, that has neither been claimed nor determined to be a discovery violation, but that is challenged at trial as deficient for failing to provide information as required by Maryland Rule 2–402(f)(1)(A).[4]

The Court in *Food Lion* held that the testimony could not be excluded on that basis. *Id.* at 717, 904 A.2d 464. Discovery rules do not provide for what expert testimony will be permitted at trial. *Id.* at 721, 904 A.2d 464. That matter is addressed expressly in Title 5 of the Rules. *Id.* Rule 5–702 provides:

> Expert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue. In making that determination, the court shall determine (1) whether the witness is

---

4. Maryland Rule 2–402(f)(1)(A) provides:

A party by interrogatories may require any other party to identify each person, other than a party, whom the other party expects to call as an expert witness at trial; to state the subject matter on which the expert is expected to testify; to state the substance of the findings and the opinions to which the expert is expected to testify and a summary of the grounds for each opinion; and to produce any written report made by the expert concerning those findings and opinions. A party also may take the deposition of the expert.

qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony.

*Id.* (quoting Md. Rule 5–702).

In *Food Lion,* McNeill answered interrogatories propounded before the discovery deadline and listed his expert therein. *Food Lion,* 393 Md. at 724, 904 A.2d 464. He attached the expert's report and subsequently forwarded a letter indicating that the expert attributed McNeill's injuries to his job. *Id.* On the day of trial, Food Lion made a motion to prohibit the expert's opinion on the grounds that the "one sentence" letter was insufficient to provide a basis for the expert's opinion. *Id.* at 725, 904 A.2d 464. The motion was filed twenty days after the trial court asked for all motions. *Id.* at 726, 904 A.2d 464. The trial court employed a Rule 5–702 analysis, concluding that the one sentence report from the expert would not be adequate to sustain the burden of proof as there was no medical conclusion. *Id.*

On appeal to an *en banc* panel of the circuit court, the trial court was found clearly erroneous because, although very brief, the report was deemed sufficient to inform any reader that the expert based his opinion upon the repetitive work of McNeill.[5] The court found significant the fact that Food Lion did not file a motion to compel or take the expert's deposition. The Court, on its own motion, granted *certiorari* and held that Food Lion attempted to meld the discovery and evidence rules cited *supra.*

Appellants, in the case *sub judice,* attempt to liken the facts in *Food Lion* to the instant case and fail on several points. First, the discovery in *Food Lion* was completed on time, but, in the instant case, appellants' expert report was filed after the discovery deadline and the motion filed in *Food Lion,* unlike the motion in this case, was filed after the deadline

---

5. McNeill was a meat cutter claiming a repetitive motion injury.

established by the court. Further, there was nothing for appellees to challenge in regard to appellants' answers to interrogatories because appellants indicated that there was no expert identified and, when he was identified, the basis for his expert opinion was not submitted until after the discovery deadline had passed.

Appellant argues that the trial court failed to take into account the five factors necessary for it to consider when materials are submitted after the deadline for completion of discovery to determine the proper sanction. *Taliaferro v. State*, 295 Md. 376, 390–91, 456 A.2d 29 (1983). In *Taliaferro*, the Court outlined the factors to be considered as:

whether the disclosure violation was technical or substantial, the timing of the ultimate disclosure, the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence, whether any resulting prejudice might be cured by a postponement and, if so, the overall desirability of a continuance. Frequently these factors overlap. They do not lend themselves to a compartmental analysis.

*Id.*

Appellant answered in March 2005 that he would seek to recover future wages and benefits totaling $1.1 million and that figure would be calculated from his current salary, *e.g.*, $2,000 per month, as opposed to what the FBI would pay him as a GS–11 employee. Appellant contends that the figures in his expert's report match the $1.1 million he initially disclosed in answers to interrogatories and, thus, the insignificant difference between the actual numbers, if anything, benefits appellees.

The trial court considered the motion *in limine* and the response thereto before issuing its order to exclude "[t]estimony from [Edelman] regarding valuation of [appellant's] lost income and benefits" and "[a]ny evidence from the [appellant] concerning lost income and/or benefits." The court found that the report was provided after the close of all discovery and, thus, violated the trial court's scheduling order.

█ Appellees contend that we should not entertain the issue of appellants' damages on appeal because the grant of its motion for judgment "was based entirely on issues of liability, not damages" and, thus, it is a "moot issue, or at least a non-issue on appeal." Appellees fail, however, to address the exceptions, we think here pertinent, to the general rule that we do not decide issues which are moot. In our recent decision, in *Dove v. Childs*, 173 Md.App. 602, 608–09, 920 A.2d 511, 514–15 (2007), we explained:

> " 'Generally, appellate courts do not decide academic or moot questions. A question is moot if, at the time it is before the Court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.' " *Attorney Gen. v. Anne Arundel Co. School Bus Contractors Assn., Inc.*, 286 Md. 324, 327, 407 A.2d 749 (1979). The Court of Appeals has recently made clear that, when moot questions are raised on appeal, this Court should dismiss the appeal on the ground of mootness. *Cottman v. State*, 395 Md. 729, 912 A.2d 620 (2006), slip. op. at 14.

> There are, however, exceptions to the general rule that appellate courts will not decide moot questions. In *Cottman*, the Court of Appeals recognized that " '[t]here is a public benefit derived from published opinions, which is the reason appellate courts are sometimes willing to decide moot questions where it appears that there are important issues of public interest raised which merit an expression of our views for the guidance of courts and litigants in the future.' " *Id.* at 15, 912 A.2d 620 (Internal quotes and citations omitted.). This Court may reach the merits of a moot question " 'where the urgency of establishing a rule of future conduct in matters of important public concern is imperative and manifest....' " *Albert S. v. Dept. of Health*, 166 Md.App. 726, 744, 891 A.2d 402 (2006) (quoting *Lloyd v. Bd. of Supervisors of Elections*, 206 Md. 36, 43, 111 A.2d 379 (1954)).

In *Lloyd,* the Court of Appeals listed the circumstances under which Maryland appellate courts may decide moot issues:

[I]f the public interest clearly will be hurt if the question is not immediately decided, if the matter involved is likely to recur frequently, and its recurrence will involve a relationship between the government and its citizens, or a duty of government, and upon any recurrence, the same difficulty which prevented the appeal at hand from being heard in time is likely again to prevent a decision, then the Court may find justification for deciding the issues raised by a question which has become moot, particularly if all of these factors concur with sufficient weight. 206 Md. at 43, 111 A.2d 379.

*Prince George's County v. Fraternal Order of Police, Prince George's County, Lodge* 89, 172 Md.App. 295, 304 (2007).

Because the issue presented is important to the public and is likely to recur in the future, we shall address the issue of damages.

We begin with appellants' first contention as to the exclusion of the expert testimony and loss of income and/or benefits.

■■■■■ We review the grant of the motion *in limine* for discovery violation under an abuse of discretion standard. *Heineman v. Bright,* 124 Md.App. 1, 7, 720 A.2d 1182 (1998). In applying sanctions for discovery violations, a large measure of discretion is entrusted to the trial court. *Id. See Tydings v. Allied Painting & Decorating Co.,* 13 Md.App. 433, 436, 283 A.2d 635 (1971); *Lynch v. R.E. Tull & Sons, Inc.,* 251 Md. 260, 261, 247 A.2d 286 (1968). In its exercise of that discretion, the trial court must consider the five factors stated supra. *Heineman,* 124 Md.App. at 8, 720 A.2d 1182.[6] Thus, we examine the *Taliaferro* factors.

---

6. Appellees attempt to distinguish appellants' use of the factors because *Taliaferro* was a criminal case. The Court of Appeals elucidated the factors in *Taliaferro* and we thereafter applied them in *Heineman,* a

## 1. Technical or Substantial Violation

■ Appellant argues that his violation was technical and not substantial because the precise methodology to be used by Edelman was disclosed by his answers to interrogatories on March 24, 2005 and appellant further disclosed, at deposition, that his pay was approximately $25,000 per year. Thus, he insists, appellees knew of the methodology as to how the lost wages would be calculated, *i.e.*, appellant's disability pay minus how much appellant would have earned at the FBI, since March of 2005. Further, the supplemental information of $2,353.16 per month only clarified the wages appellant disclosed in the March 2005 interrogatory answers as $2,000 per month. The salary appellant finally relied upon was lower than that which he claimed in his answers to interrogatories and, thus, appellees were so informed.

Appellant also contends that his failure to supply documents of his actual earnings in 2005 was a technical—and not substantial—violation because none of the documents significantly changed the information he provided appellees in March 2005. Appellees counter that they were prejudiced by the withholding of the documents and contend that appellant had the documents as early as June 2005.

While appellants did notify appellees of Edelman's testimony, they did not provide the basis for such testimony. Appellants' designation of Edelman stated that his analysis would be "contingent on the receipt of documents related to salary and benefits paid to FBI employees for the position offered to [appellant]." That the numbers eventually arrived at by the expert were close to those supplied by appellant at deposition does not mean that, at the time of discovery, Edelman's opinions and the bases for those opinions were disclosed and, thus, the violation of the order was substantial.

---

civil case. Thus, we conclude that, absent cases involving extraordinarily complex litigation, the factors must be given considerable weight. *Eagle–Picher v. Balbos*, 84 Md.App. 10, 34, 578 A.2d 228 (1990), *aff'd in part, rev'd in part on other grounds*, 326 Md. 179, 604 A.2d 445 (1992).

## 2. Timing of Disclosure

■■■ The discovery period was extended to December 30, 2005. The trial court denied appellants' motion to extend the discovery period and trial date. Appellants did not relay the information necessary for appellees to mount their defense until eight working days before trial. Irrespective of the concessions appellants were willing to make as to the deposing of their expert, the parties could not, upon their own volition, agree to reopen discovery.

The delay in obtaining the expert report did not allow appellees sufficient time to prepare their defense and was therefore prejudicial. The delay was substantial because it occurred almost two and a half months after the close of the discovery period and twelve days before trial. Appellants' counsel noted the untimeliness in an e-mail sent prior to faxing the report wherein he suggested that evenings and weekends could be made available for deposition. Appellants' argument that appellees should have known what would be in their expert's report falls short of the mark of the report itself which, although not required, contained the bases upon which Edelman would render his opinion as to appellants' economic losses.

## 3. Reason for Violation

The reason given by appellants for their late filing was that the FBI refused to cooperate in regard to deposing Onesko. Appellant supplemented his answers to interrogatories with an IWIF form, stating that he had received $562 per week in 2005, a December 13, 2005 "NOTICE OF RETIREMENT ALLOWANCE" indicating he would be paid $2,353.16 per month and a letter dated January 5, 2006 from IWIF terminating his weekly temporary disability checks as of December 22, 2005. Appellant claims that the dates on the facsimile documents could not be correct because, as of June 6, 2005, some documents had yet to be created. In any event, the information was available to appellant before the discovery deadline and could have been provided to appellees. The

prejudice to appellees in receiving the documents after discovery and twelve days before trial outweighs any prejudice to appellants.

### 4.  Degree of Prejudice

■ Appellees argue that they were prejudiced by receiving the materials with only "eight working days" from the date of trial in which to depose Edelman, or at that late date, "to have a defense expert look at and respond to such a late report." Appellants, on the other hand, contend that appellees already had substantially the same information from appellant's deposition in March 2005 and simply refused to accommodate appellant's requests.

■ Discovery was extended by a consent motion and the court has "a substantial interest in discouraging the blatant disregard of discovery deadlines by litigants." *Heineman*, 124 Md.App. at 10, 720 A.2d 1182. The amounts in evidence are similar to those contained in the expert report; accordingly, we find neutral the degree of prejudice for either party by the trial court's grant of the motion *in limine*.

### 5.  Curative Postponement

■ Appellants argue that the trial court should have allowed the evidence to come in because it was newly received and substantially the same as given by appellant in deposition. Appellees counter that appellants' disclosures came after the close of discovery and denial of a motion to reopen discovery and postpone the trial. A postponement, insist appellants, would have benefitted appellees, but was unnecessary because appellants were in possession of the information within the time frame allocated by the trial court in July 2005.

We must weigh all of the factors to determine whether the trial court abused its discretion. *Id.* The nature of the disclosure, timing and reason all favor appellees because Edelman's bases for his opinions and the limited time appellees had to

respond, coupled with the fact that the information was available to appellants prior to December 30th,[7] weigh heavily against appellants.  We view the degree of prejudice as a neutral factor.  Clearly, the trial court took into consideration that appellant stated in answers to interrogatories that he was "retaining an expert who will document my lost pay and benefits in his report" and "[t]hat report [would] be produced once it [was] completed and [would] more accurately document [appellant's] damages," but that ultimately, he failed to produce the report within the required time frame.

Appellants contend that the failure to follow the trial court's scheduling order and meet the discovery deadline should be excused because appellees could, or should, have guessed that the information relied upon by appellant and his expert was already in evidence and, thus, the late filed information, because it "benefitted" appellees, should be accepted.  We cannot conclude that the trial court abused its discretion when it determined that a balance of these factors favored the exclusion of appellants' expert.

The determination by a trial court as to when discovery should be concluded ordinarily rests in the exercise of its sound discretion.  *Hirsch v. Yaker,* 226 Md. 580, 584, 174 A.2d 728 (1961).  The trial court has broad discretion in fashioning a remedy for the violation of discovery rules.  *Warehime v. Dell,* 124 Md.App. 31, 43, 720 A.2d 1196 (1998).  Absent a clear abuse of discretion, we will not disturb its ruling.  *Massie v. State,* 349 Md. 834, 851, 709 A.2d 1316 (1998).  As we observed in *Naughton v. Bankier,* 114 Md.App. 641, 653, 691 A.2d 712 (1997), "if scheduling orders are to be permitted to be treated in such a casual fashion, why bother with them?"

We now turn to questions two through four, which pertain to the trial court's grant of judgment in appellees' favor.

---

7. Notwithstanding that the IWIF letter came on January 5, 2006, appellant knew or should have known that the IWIF payments had ended when he accepted retirement.

## MOTION FOR JUDGMENT

Appellants next assign error to the standard applied by the trial judge in granting appellees' motion for judgment. Appellants claim that, because appellant signed a release form, the court found appellants' claim barred because there was insufficient evidence that the statements were made with malice. That analysis only applies to the question of whether there was a waiver of the conditional privilege, accorded to appellees, concerning statements made in evaluating appellant's prior employment because both privileges can be forfeited.

On November 21, 2003, appellant received a letter from the FBI advising him that the "conditional offer of appointment letter dated July 17, 2003 is hereby rescinded." He was further advised that the decision was reached based on information from a variety of sources. "These sources," the letter continued, "include your application for employment, comments obtained during the background investigation, and results of various record checks. In your case, information that was developed concerning your employment history with Sharpsburg/Smithsburg Emergency Medical, Smithsburg, Maryland, indicates that you may not be suitable for employment with the FBI." Appellant was then advised, "You may request specific information from your file under the provisions of the Freedom of Information/Privacy Acts (FOIPA) by submitting a written request." In response to appellant's request, the FBI forwarded the following report, detailing the basis for the Agency's decision to rescind its conditional offer of appointment.

> The investigation disclosed that Robert Myerley, Smithsburg Emergency Medical (EMS), was a coworker from 1/01 to 8/01. Mr. Myerley who is the Assistant Chief, advised that *the applicant was in charge of the drug box and was responsible for making sure that the drugs were up-to-date. The applicant also did the billing and ordering of medical supplies, and was responsible for maintenance of the ambulances. Mr. Myerley explained the termination of the applicant's employment as follows: The applicant wasn't*

*doing his job.* Instead of coming in to do what he was suppose[d] to do, the applicant would come in and just sit; he was not doing anything. When the new guy took over, they were almost a year behind in paying their bills. Mr. Myerley further advised that at first the applicant had been doing his job, but at a certain point he quit functioning. He explained that it was possible that the applicant was not getting along with the [ ] although there may have been other reasons for the applicant's failure to perform. It was noted that [ ] his address is unknown. Mr. Myerley did not recommend the applicant for a position with the FBI. For information purposes, applicant revealed on his FD–140 that he was earning $30,000 a year as a Paramedic Administrator, and left this employment due to "spouse new job."

(Emphasis added).

■ At common law, there exists a qualified privilege for "communications arising out of the employer-employee relationship." *McDermott v. Hughley,* 317 Md. 12, 28, 561 A.2d 1038 (1989) (a person will not be held liable when acting in furtherance of a social interest of importance). In Maryland, an employer who authors statements in regard to a former employee's performance has a conditional privilege codified in the Courts and Judicial Proceedings Article § 5–423, Immunity—Disclosure of Information Regarding Employee or Former Employee, which provides that:

(a) An employer acting in good faith may not be held liable for disclosing any information about the job performance or the reason for termination of employment of an employee or former employee of the employer:

(1) To a prospective employer of the employee or former employee at the request of the prospective employer, the employee, or former employee; or

(2) If requested or required by a federal, State, or industry regulatory authority or if the information is disclosed in a report, filing, or other document required by law, rule, order, or regulation of the regulatory authority.

(b) An employer who discloses information under subsection (a) of this section shall be presumed to be acting in good faith unless it is shown by clear and convincing evidence that the employer:

(1) Acted with actual malice toward the employee or former employee; or

(2) Intentionally or recklessly disclosed false information about the employee or former employee.

Md.Code Ann., Cts. & Jud. Proc. § 5–423.[8]

Waiver of the common law privilege occurs if the statement was made with malice. *Woodruff v. Trepel*, 125 Md.App. 381, 402, 725 A.2d 612 (1999) (holding that, whether a conditional privilege exists, "is a question of law for the judge"); *McDermott*, 317 Md. at 28, 561 A.2d 1038. Once established by the trial court, "qualified or conditional privileges in defamation cases are forfeited only upon a showing of actual malice; that is, a defendant who makes statements with knowledge of their falsity or with reckless disregard for the truth is not protected." *Rosenberg v. Helinski*, 328 Md. 664, 677–78, 616 A.2d 866 (1992). Whether the conditional privilege has been abused is a jury question "subject to the censorial power of the judge where there is no evidence of malice, and the burden on the issue is on the plaintiff." *Woodruff*, 125 Md.App. at 402, 725 A.2d 612. Malice is defined as "[k]nowledge of falsity or reckless disregard for truth . . . ." *McDermott*, 317 Md. at 29, 561 A.2d 1038 (quoting *Marchesi v. Franchino*, 283 Md. 131, 139, 387 A.2d 1129 (1978)). The statutory immunity can be waived if appellees acted with "actual malice toward the . . . [appellant]; or intentionally or recklessly disclosed false information" about him. See Md.Code Ann., Cts. & Jud. Proc § 5–423(b), *supra.*

"If the communication is made, not at all for the purpose of protecting interests legally recognized, nor in the performance of a duty which the law encourages, the pretense

---

8. Unless otherwise indicated, the Court shall refer to Md.Code Ann., Cts. & Jud. Proc. (2006).

under which it is made, instead of furnishing a defense, will aggravate the case." *Orrison v. Vance*, 262 Md. 285, 294, 277 A.2d 573 (1971) (citation and internal quotations omitted). Thus, actual malice does not only mean ill-will. *Id.* at 295, 277 A.2d 573. Actual malice is better described as a purpose not within the social policy of which the law secures the "technical device of privilege." *Id.* The *Orrison* Court held that, in that context, malice means "a reckless disregard of truth, the use of unnecessarily abusive language, or other circumstances which would support a conclusion that the defendant acted in an ill-tempered manner or was motivated by ill-will." *Id.*

Appellants argue that whether appellees acted with malice required the trial court to consider all of the surrounding circumstances, such as appellee's reasonable belief in his statements, any excessive nature of the language he used, whether the disclosures were unsolicited and "whether the communication was made in a proper manner and only to proper parties." *Id.*

According to appellant, the trial court applied the wrong standard of proof in granting the motion for judgment because the trial judge improperly reviewed the evidence to determine whether, by clear and convincing evidence, appellant had produced sufficient evidence to determine whether the conditional privilege was waived. The trial judge, he maintains, was not permitted to review the motion for judgment by the standard of proof that the jury would ultimately judge the case.[9]

## STANDARD OF REVIEW

Whether the trial court applied the correct standard of proof in adjudging its grant of appellees' motion for

---

9. Appellants additionally argue that the trial court used a higher standard than that required by the jury to decide the case because the trial judge intimated to the jury that clear and convincing evidence is a higher standard than that of beyond a reasonable doubt. The judge's error was made to the jury after the motion was granted and had no bearing on the grant of the motion and is not germane to the instant appeal.

judgment is a question of law that we review *de novo. Coleman v. Anne Arundel County Police Dept.,* 369 Md. 108, 121, 797 A.2d 770 (2002). "We review the grant of a motion for judgment under the same standard as we review grants of motions for judgment notwithstanding the verdict." *Tate v. Bd. of Educ. of Prince George's County,* 155 Md.App. 536, 544, 843 A.2d 890 (2004) (citing *Johnson & Higgins of Pa., Inc. v. Hale Shipping Corp.,* 121 Md.App. 426, 450, 710 A.2d 318 (1998)). The Court assumes the truth of all credible evidence on the issue and any inferences therefrom in the light most favorable to appellants, the nonmoving parties. *Id.* (citation omitted). "Consequently, if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, the case must be submitted to the jury for its consideration." *Id.* at 545, 843 A.2d 890 (citing *Washington Metro. Area Transit Auth. v. Reading,* 109 Md.App. 89, 99, 674 A.2d 44 (1996)).

What standard of proof to apply in a motion for judgment NOV was at issue in *Hoffman v. Stamper,* 385 Md. 1, 867 A.2d 276 (2005) (Hoffman argued that we considered only whether there was any evidence no matter how slight to review a denial of a motion for judgment versus clear and convincing evidence). In the instant case, both parties have quoted selective passages from *Hoffman* in which the Court of Appeals opined that:

> Hoffman's argument [arose] from the statement by the Court of Special Appeals that, in a civil jury case, "if there is any evidence adduced, however slight, from which reasonable jurors could find in favor of the plaintiff on the claims presented, the trial court should deny the defendant's motion for judgment at the close of the evidence and submit the claims to the jury for decision." *Hoffman, supra,* 155 Md.App. at 288, 843 A.2d at 178. That is a correct statement, which mirrors what this Court has said in many cases. It would, however, be more precise if it read, "from which reasonable jurors, applying the appropriate standard of proof, could find in favor of the plaintiff on the claims presented." In *Darcars v. Borzym,* 379 Md. 249, 270, 841

A.2d 828, 840 (2004), we essentially made that point-that, in deciding a motion for judgment, a court "must account for and consider the appropriate burden of persuasion in deciding whether to allow the jury to decide an issue." Even though the Court of Special Appeals failed to cite *Darcars* when discussing this point, there is no indication that the intermediate appellate court failed to apply the appropriate standard in its review. It understood that fraud needed to be shown by clear and convincing evidence and, indeed, believed that conspiracy required that heightened standard of proof as well.

*Hoffman,* 385 Md. at 16–17, 867 A.2d 276 (footnote omitted).

In *Darcars Motors of Silver Spring, Inc. v. Borzym,* 150 Md.App. 18, 818 A.2d 1159 (2003) [*Darcars I*], we held that the clear and convincing standard of proof had no bearing on the trial court's "determination of the sufficiency of the evidence supporting actual malice." *Darcars Motors of Silver Springs, Inc. v. Borzym,* 379 Md. 249, 267, 841 A.2d 828 (2004) [*Darcars II*]. *Darcars I,* we reasoned, stood for the proposition that the clear and convincing evidence related only to the jury's consideration of the burden of persuasion. *Id.* The Court of Appeals held that our view contradicted both its precedent and that of the Supreme Court. *Id.*

The *Darcars* Court held that a trial judge must consider evidence presented through the prism of the standard of proof that jury deliberations required because "the burden of production fluctuates depending on the burden of persuasion in a given case." *Id.* at 268, 270, 841 A.2d 828. For example, a judge must not let the jury decide a criminal defendant's guilt or innocence if the evidence could not establish the defendant's guilt beyond a reasonable doubt. *Id.* at 270, 841 A.2d 828. "Likewise, a judge must not allow the jury to consider the issue of 'actual malice' unless the evidence could establish 'actual malice' *clearly and convincingly.*" *Id.* (emphasis in original).

Thus, in the case *sub judice,* the trial court had to decide whether appellants met their burden of production with evi-

dence, however slight, that the jury, applying a "clear and convincing" standard to shoulder the burden of persuasion, could find that appellees forfeited their conditional privilege and acted intentionally and willfully such that appellants' claims could reach the jury. The trial court did not apply the wrong standard of proof with regard to the motion for judgment:

> "Actual malice" cannot be established merely by showing that: the publication was erroneous, derogatory or untrue; the publisher acted out of ill will, hatred or a desire to injure . . .; the publisher acted negligently; the publisher acted in reliance on the unverified statement of a third party without personal knowledge of the subject matter of the defamatory subject; or the publisher acted without undertaking the investigation that would have been made by a reasonably prudent person. Moreover, malice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was " 'substantially correct' " and "there was no evidence to impeach the [publisher's] good faith," *New York Times Co. [v. Sullivan]*, 376 U.S. [254,] at 286, 84 S.Ct. [710,] at 729 [, 11 L.Ed.2d 686].
>
> *Capital–Gazette Newspapers, Inc. v. Stack*, 293 Md. 528, 539–40, 445 A.2d 1038 (1982) (emphasis added; other citations omitted).

*Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 512–13, 665 A.2d 297 (1995) (emphasis omitted).

Appellants incorrectly assert that, *"unless there is no evidence whatsoever* of malice," the jury must decide, as a question of fact, whether the privilege has been forfeited. (Emphasis added by appellants). As discussed *supra,* the jury decides whether the conditional privilege has been abused after a trial court determines that the conditional privilege exists and there is evidence in the record for such a jury determination. In *Exxon Corp.*, there was evidence that accusations of theft were later retracted, and excessive publication in the presence of persons who had no interest in the information. *Exxon Corp., USA v. Schoene*, 67 Md.App. 412,

422, 508 A.2d 142 (1986) (remanding for a new trial where evidence existed in the record that the conditional privilege was abused).

Concluding that there was no evidence in the record from which the jury could find malice, the trial judge reasoned that

there is no clear and convincing evidence, as a matter of fact there is no evidence at all in this [c]ourt's mind as to actual malice towards the [appellants]. And there is no evidence, as far as I'm concerned, and certainly not clear and convincing evidence, whether it was intentional. The third criteria was is there clear and convincing evidence that was recklessly disclosed-that [appellee] recklessly disclosed false information about [appellant]?

\* \* \*

So I'll grant at this point partial judgment in favor of the [appellees] concerning defamatory statements concerning clear and convincing evidence as to actual malice and whether or not it was intentional.

\* \* \*

Since I granted judgment, since there is not clear and convincing evidence, and I have granted judgment on count one concerning actual malice or intent, that basically takes the teeth out of count two because there has to be intent and it has to be willful. And it's not there. So I am granting the [appellees] motion for judgment in its entirety as to count two.

\* \* \*

Let's assume some of the information is false. Let's assume that [appellee], what [appellee' s] doing is really parroting information that was given to him in 2001 when [appellant] was a volunteer EMS and the chief at the time was Chief Sturm.... And the evidence is uncontradicted that .... [appellee] didn't know what this investigation was about or who it was about. And [appellee], and it's uncontradicted when he was shown the release, took it to [the Chief] and said he had concerns.... And [the Chief] said, "Oh this is

fine, answer all the questions." And basically what it is he answered questions, he indicated a couple of situations from personal knowledge.... back in 2001 when the [appellant] was there for seven or eight months as whether a volunteer or paid employee. It doesn't make any difference. Fast forward to 2003, what he was told probably in 2001 by Chief Sturm when the [appellant] was no longer employed there, that's why we get over this "Well we can't afford to pay him anyway. We let him go." I agree "letting go" is not the same thing as termination. So basically what [appellee] was stating to the FBI agent was information he had received or remember [sic] that Chief Sturm told him back in 2001 when [appellant] left plus his own personal observations. And that was about it.

Further discussing the grant of the motion for judgment and the standard by which the question could reach the jury, the court stated:

The question I've got is there clear and convincing evidence at this point that there was recklessly disclosed false information about the [appellant]? Now the point is whether it was false information or not, I don't know. Obviously the [appellant] alleges there [sic] false information disclosed by [appellee]. Did [appellee] know it was false information when he disclosed it? I don't know. Is it by a preponderance of the evidence? No. It has to be recklessly disclosed. It has to be by clear and convincing evidence.

And I know the appellate courts feast on this kind of stuff when it goes down on appeal regardless of which way I rule, especially before a case goes to the jury. But I find from the evidence, I find no clear and convincing evidence of recklessly disclosed false information. There may have been false information but there is no evidence that [appellee] knew it was false. And there is no clear and convincing evidence that it was recklessly disclosed.

Appellants argue that the trial court's findings were erroneous in concluding that SEMS "terminated" appellant, appellant was not properly maintaining the drug boxes, appellant

was not getting billing sheets done and that appellant brought his children to work.

Testimony indicated that Chief Sturm and SEMS employee, Brigit Heller, informed appellee in regard to the drug boxes and billing. Ms. Heller did not recall a discussion nor did she deny one as she testified she could not remember.[10] The minutes of the February 4, 2004 meeting, relied upon by appellants, contain no exact statement by appellee and the only testimony at trial in regard to appellant's lateness came from appellee:

> [Appellants' counsel]: Now was [appellant] ever late for work many times like it states in the SEMS minutes?
>
> [Appellee]: I can't answer that I ran from my house a lot.
>
> [Appellants' counsel]: Okay. So you wouldn't have had any knowledge of whether [appellant] was late for work?
>
> [Appellee]: Again I can't answer that.
>
> [Appellants' counsel]: So that's a no?
>
> [Appellee]: No.

Appellee testified that he recalled incidents when appellant's children came to work with appellant.

Viewing all of the evidence in the light most favorable to appellants, a jury could not have reached the conclusion that appellees, with "knowing falsity or reckless disregard for the truth," entertained any serious doubts as to the truth of their publication. *See Marchesi, supra,* 283 Md. at·137, 387 A.2d 1129. A lack of knowledge on appellee's part does not demonstrate an awareness of probable falsity or reflect his serious doubts as to the truth of what he conveyed to the FBI. Appellee was not forewarned of the FBI's investigation. Appellee personally observed appellant's behavior and related to

---

10. Appellants argue in their reply brief that Heller's testimony leads to the inference that she would have only discussed such matters with the Chief or "an ALS provider." As Heller was unable to deny the conversation with appellee, we will not presume it could not have occurred.

his superiors other information. The evidence does not reflect that appellee knew his information was inaccurate or false.

We hold that the trial court did not err in finding that the evidence did not support appellants' offer of proof that appellees acted intentionally or willfully or that there was evidence from which the jury could have found appellees intentionally interfered with appellants' prospective business relations.

**JUDGMENT OF THE CIRCUIT COURT FOR WASHINGTON COUNTY AFFIRMED.**

**APPELLANTS TO PAY COSTS.**