<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-1391**

MICHAEL L. SPENCE,

                    Plaintiff - Appellant,

          v.

NCI INFORMATION SYSTEMS, INCORPORATED,

                    Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore.   Benson Everett Legg, Chief District Judge.   (1:05-cv-03127-BEL)

Argued:  December 10, 2010          Decided:  March 15, 2011

Before MOTZ, GREGORY, and WYNN, Circuit Judges.

Affirmed by unpublished opinion.   Judge Wynn wrote the opinion, in which Judge Motz and Judge Gregory joined.

**ARGUED**: Peter F. Axelrad, COUNCIL, BARADEL, KOSMERL & NOLAN, PA, Annapolis, Maryland, for Appellant.   Kevin B. McCoy, KRUCHKO & FRIES, McLean, Virginia, for Appellee.   **ON BRIEF**: John G. Kruchko, KRUCHKO & FRIES, McLean, Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

In Maryland, an employer is not liable for disclosing information about a former employee's job performance "unless it is shown by clear and convincing evidence that the employer . . . [a]cted with actual malice . . . or . . . intentionally or recklessly disclosed false information."[*] In this appeal, Plaintiff Michael L. Spence alleges that his former supervisors made defamatory statements to his prospective employer. Because we conclude that Plaintiff failed to produce sufficient evidence that his former supervisors spoke with actual malice or intentionally or recklessly disclosed false information, we affirm the district court's judgment.

I.

NCI Information Systems, Inc. ("NCI") hired Plaintiff as a computer forensics specialist in March 2002. His primary job function was to examine NCI's clients' computers to determine if they were being used for improper purposes. When Plaintiff commenced work at NCI, his direct supervisor was Nanette Okuda. Okuda answered to Brad Sexton, who indirectly supervised Plaintiff.

---

[*] Md. Code Ann., Cts. & Jud. Proc. § 5-423 (West 2010).

2

Okuda reviewed Plaintiff's performance in May 2002. The review was generally favorable. Plaintiff received "fully-qualified" ratings, with scores between five and seven on a ten-point scale, in various categories of his job performance. In the narrative portion of the performance review, Okuda wrote the following commendations:

> [Plaintiff] is very knowledgeable about computer forensics. . . . [H]e is the most knowledgeable on the use of the EnCase software being utilized for the gathering and reporting of computer forensics evidence. He is very precise in the execution of the forensics examination. He is conscientious and hard-working. . . . He is ready to assist coworkers . . . . He has established a rapport with all the personnel that work in the NNSA Cyber Forensics Center. . . . He is conscientious about keeping me informed about the day-to-day operations of the NNSA Cyber Forensics Center. He has an eagerness to learn as much as possible about the area of cyber forensics.

However, the remainder of the May 2002 performance review was not so favorable. Okuda noted that

> [Plaintiff] does not recognize that his actions and words frequently have an adverse effect on NCI and the NNSA Cyber Forensics Center. For example, referring to himself as a member of the Nevada Cyber Crimes Task Force (NCCTF). . . . I have repeatedly reminded [Plaintiff] that our primary job is to support the NNSA Enterprise first and foremost. . . . Organization of the cases that he has worked and is currently working does not seem to be a priority. . . . His attention to detail other than forensics examination is lacking, such as the requirements for the monthly status reports, format of his personal case summary report, and assigning a case number and starting a folder for every case.

3

The May 2002 performance review also contained a space for employee comments. Plaintiff complained that his salary did not reflect the industry standard for computer forensics specialists, and he requested "a salary adjustment in the range of $75,000-$85,000 per year." Plaintiff also had multiple conversations about a salary increase with Sexton and non-management employees at NCI. Sexton eventually became frustrated at having the same conversation and warned Plaintiff that "[h]aving conversations with anybody else [other than management] is not going to be productive."

At some point, Plaintiff discovered that his salary was lower than the salary paid to Holly Dale, the other computer forensics specialist at NCI. Based on the pay disparity, Plaintiff filed charges of discrimination and retaliation against NCI in the Nevada Equal Rights Commission ("NERC") on July 16, 2002. The NERC transferred the case to the United States Equal Employment Opportunity Commission, which ultimately dismissed the charges and issued Plaintiff a right-to-sue letter.

Meanwhile, NCI designed a Performance Improvement Plan ("PIP") for Plaintiff on September 3, 2002. Between the May 2002 performance review and the PIP, Okuda documented, consistent with NCI policy, numerous incidents in which Plaintiff was disrespectful and confrontational, disagreeable

4

with female employees, or lacking necessary organizational skills. The PIP accordingly targeted these areas for improvement: 1) unprofessional behavior and interpersonal skills; 2) written communication; and 3) managing deadlines. The PIP established specific goals and objectives to improve each unsatisfactory area of job performance.

Near the beginning of October 2002, NCI hired Mike Sanders, who replaced Okuda as Plaintiff's direct supervisor. Sanders had previously served in the Air Force and spent fourteen years as an investigator with the Air Force Office of Special Investigations ("AFOSI"). According to his deposition testimony, Sanders observed early on that Plaintiff "had significant issues with female employees," particularly Dale.

At the end of October 2002, Plaintiff attended a training seminar along with Sanders and Dale. On the first day of the seminar, Plaintiff made a remark about Dale, causing other attendees to laugh. Sanders "immediately yanked [Plaintiff] out of the class, took him outside the building near the air conditioner . . . and chewed his ass right there on the spot." The next day, Dale and a few others were unable to participate in the seminar because their computers were hacked and their root passwords changed. On the third day, the same prank occurred, but Dale was the sole victim. Suspecting Plaintiff, Sanders asked the seminar administrator to investigate which

5

computer was responsible for the hacking. The administrator determined that Plaintiff was responsible, and Sanders terminated Plaintiff's employment a few days later.

Thereafter, in 2003, Plaintiff applied for a computer forensics specialist position with the Air Force. The position required an extensive background investigation by AFOSI that consisted of a financial background check and interviews with the prospective employee's former supervisors and neighbors. AFOSI therefore interviewed Okuda, Sexton, and Sanders about Plaintiff's performance at NCI.

On March 2, 2004, AFOSI issued a Report of Investigation ("ROI") recommending that Plaintiff's application be denied. The ROI contained summaries and paraphrased statements made by Plaintiff's former supervisors. The ROI related Sanders's interview as follows:

> SANDERS would not recommend [Plaintiff] for any position related to computer forensics. [Plaintiff] lacked the ability to work with others and often failed to meet the requirements set forth by [Plaintiff's] supervisors and customers. [Plaintiff] was not a violent person, but was often rude to co-workers and customers. SANDERS would not release specific information regarding the termination because he feared [Plaintiff] maintains a vindictive attitude, which [Plaintiff] would use to pursue civil action against his company.

The ROI attributed the following statement to Okuda:

> [Plaintiff] was not well liked within the workplace. [Plaintiff] was friendly with coworkers, but often lacked some of the social skills needed to

6

successfully complete the mission. [Plaintiff] maintained a good relationship with male employees, but possessed a disrespectful and somewhat chauvinistic attitude toward female employees, specifically his superiors. On one particular incident, [Plaintiff] initiated a fistfight with a male co-worker in the office. [Plaintiff] possesses a temper and could possibly be vindictive. [Plaintiff] had an eager attitude toward assigned tasks, but often worked outside certain guidelines and policies. During the seven months, [Plaintiff] was given a "get well" plan due to his poor performance, which [Plaintiff] routinely failed to meet the prescribed requirements. OKUDA related she would not recommend [Plaintiff] for a computer forensics position.

Finally, the ROI contained this recitation of Sexton's interview:

[Plaintiff] was completely unreliable, untrustworthy, and frequently failed to meet deadlines set forth by the management. SEXTON would not release specific information regarding the termination because he feared [Plaintiff] maintains a vindictive attitude, which [Plaintiff] would use to pursue civil litigation against his company. . . . SEXTON adamantly stated he would not recommend [Plaintiff] for any position, and [Plaintiff] is not welcome for a position with NCI in the future.

The ROI also documented as "potentially disqualifying" Plaintiff's strained financial background and at least one unfavorable interview by a neighbor.

Plaintiff sued NCI for defamation and false light invasion of privacy based on the interview statements of Sanders, Okuda, and Sexton. The district court granted summary judgment for NCI, ruling that Plaintiff produced insufficient evidence of

7

actual malice to overcome NCI's conditional privilege under Maryland law. Plaintiff appeals.

## II.

We review the district court's grant of summary judgment de novo. Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1127-28 (4th Cir. 1987). Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Fed. R. Civ. P. 56(c)(2). A genuine issue exists if "'there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.'" Felty, 818 F.2d at 1128 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986)).

Under Maryland caselaw, to prove a claim of defamation, a plaintiff must establish that: 1) the defendant made a defamatory statement to a third person; 2) the statement was false; 3) the defendant was legally at fault in making the statement; and 4) the plaintiff suffered harm. Rosenberg v. Helinski, 328 Md. 664, 675, 616 A.2d 866, 871 (1992). Maryland

8

recognizes a claim for false light invasion of privacy if 1) "'the false light in which the other person was placed would be highly offensive to a reasonable person,'" and 2) "'the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.'"  Ostrzenski v. Seigel, 177 F.3d 245, 252 (4th Cir. 1999) (quoting Bagwell v. Peninsula Reg'l Med. Ctr., 106 Md. App. 470, 513-14, 665 A.2d 297, 318 (1995)).

Claims of defamation and false light against an employer are subject to a conditional privilege in Maryland.  Bagwell, 106 Md. App. at 513-14, 665 A.2d at 318-19.  Maryland employers may generally disclose information about a former employee's job performance to an inquiring prospective employer.  Cts. & Jud. Proc. § 5-423(a); Happy 40, Inc. v. Miller, 63 Md. App. 24, 35, 491 A.2d 1210, 1216 (1985) ("[W]here the defamatory publication is . . . in response to an inquiry and not volunteered, the defendant is afforded greater latitude in what he may say about the plaintiff without incurring liability.").  To overcome this conditional privilege, a plaintiff must prove by "clear and convincing evidence that the employer" either "acted with actual malice" or "intentionally or recklessly disclosed false information."  Cts. & Jud. Proc. § 5-423(b).

Relying on favorable statements in his May 2002 performance review, Plaintiff contends that his former supervisors'

9

unfavorable statements in the ROI are circumstantial evidence that the supervisors spoke with actual malice or an intent to disclose false information. For example, Plaintiff argues that because the May 2002 performance review lauded Plaintiff as "conscientious and hard working," a jury could reasonably infer that Sexton spoke with actual malice when he called Plaintiff "untrustworthy," "vindictive," and "completely unreliable" in the AFOSI interview. Plaintiff makes the same argument as to Sanders's and Okuda's interview statements.

On this record, however, a mere comparison of contrasting statements in the May 2002 performance review and the ROI "is not significantly probative" evidence of actual malice or disregard for truth. Felty, 818 F.2d at 1128. The May 2002 performance review occurred just three months after Plaintiff started at NCI, and it was not entirely favorable to Plaintiff. Over the next five months, NCI documented a laundry list of incidents and confrontations involving Plaintiff, prompting the PIP and culminating in Plaintiff's termination for misbehaving at the training seminar. Thus, descriptions of Plaintiff in the ROI as "untrustworthy," "vindictive," "completely unreliable," and "disrespectful and somewhat chauvinistic" are substantially supported by documentation of Plaintiff's job performance in the record. In that light, a jury could not reasonably infer that the supervisors spoke with actual malice or disregard for the

10

truth merely by comparing statements in the ROI to statements in the May 2002 performance review.

We acknowledge that Okuda's statement that "[Plaintiff] initiated a fistfight with a male co-worker in the office" presents a closer question because it suggests that Plaintiff was the aggressor in a fistfight at NCI, and the record does not support that assertion. However, Okuda expounded in her deposition that this statement was a response to the interviewer's question, and it was based on information she received from Plaintiff himself. Significantly, Plaintiff does not contend that Okuda's statement was a fabrication or that he never communicated such information to Okuda. Thus, even if Okuda's statement is factually inaccurate, Plaintiff did not produce evidence that she made the statement with malice or disregard for the truth. See Lowery v. Smithburg Emer. Med. Serv., 173 Md. App. 662, 685, 920 A.2d 546, 559 (2007) ("[M]alice is not established if there is evidence to show that the publisher acted on a reasonable belief that the defamatory material was substantially correct and there was no evidence to impeach the [publisher's] good faith . . . .") (citation and quotation marks omitted).

In sum, we agree that Plaintiff failed to produce sufficient evidence for a reasonable jury to conclude that his former supervisors spoke with actual malice or disregard for the

11

truth.  Therefore, the statements in the ROI are conditionally privileged under Maryland law.  Given this conclusion, we need not decide whether NCI's statements are entitled to an absolute privilege.

## III.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

12