<u>Elliot Dackman, et al. v. Daquantay Robinson, et al.</u>, No. 60, September Term, 2018

**LEAD-BASED PAINT CASE – ADMISSION OF EXPERT TESTIMONY – MARYLAND RULE 5-702(3) – SUFFICIENT FACTUAL BASIS – MOTION *IN LIMINE*** – Court of Appeals held that vocational rehabilitation expert's testimony, and, specifically, her opinion as to plaintiff's vocational and educational attainment absent cognitive deficits, were supported by sufficient factual basis, as required by Maryland Rule 5-702(3). Court determined that case law does not establish requirement that expert in lead-based paint case must utilize statistical data or specific studies to have adequate factual basis to support opinion as to plaintiff's vocational and educational attainment absent deficits. Sufficient factual basis supporting opinion as to plaintiff's vocational and educational attainment absent deficits need not be predicated on statistical data, but instead may be grounded in expert's detailed and individualized assessment of information about plaintiff, coupled with expert's experience and training, as was circumstance in this case. Court concluded that trial court did not abuse its discretion in admitting vocational rehabilitation expert's testimony and, in turn, admitting economic expert's testimony, which relied on vocational rehabilitation expert's opinions. Court held that trial court did not abuse its discretion in denying motion *in limine* to exclude economic expert's testimony and report as untimely, and in admitting economic expert's testimony at trial.

Circuit Court for Baltimore City
Case No. 24-C-12-006890

Argued: February 28, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 60

September Term, 2018

_____

ELLIOT DACKMAN, ET AL.

v.

DAQUANTAY ROBINSON, ET AL.

_____

Barbera, C.J.
Greene
McDonald
Watts
Hotten
Getty
Adkins, Sally D. (Senior Judge,
Specially Assigned),

JJ.

_____

Opinion by Watts, J.

_____

Filed: June 24, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In this lead-based paint case, we are once again asked to address issues that are related to the admissibility of expert testimony. Unlike many of the lead-based paint cases that have come before this Court, this case does not involve an issue as to the reasonable probable source of lead exposure or medical causation. Instead, we decide whether the trial court abused its discretion in admitting expert testimony from two of the plaintiff's experts—a vocational rehabilitation expert and an economic expert. The vocational rehabilitation expert opined that, with the cognitive deficits caused by exposure to lead, the plaintiff would not have the academic and intellectual competency of a high school graduate, would work in unskilled or low-level semi-skilled jobs, and would have the earning capacity of someone with less than a twelfth-grade education. The vocational rehabilitation expert also opined that, absent cognitive deficits caused by exposure to lead, the plaintiff would have been able to graduate high school and attend a vocational technical school or a community college "where he would learn some type of . . . hands-on work." Relying on the vocational rehabilitation expert's conclusions about the plaintiff's vocational probabilities with and without deficits and general statistical data, the economic expert opined that the plaintiff's loss of earning capacity over his lifetime—the difference between his earning capacity absent deficits (*i.e.*, an individual with some college education) and with deficits (*i.e.*, an individual who was "a below[-]average high school graduate")—was $1,073,042.

We decide whether the trial court abused its discretion in admitting the vocational rehabilitation expert's testimony and, in turn, the economic expert's testimony. Specifically, we decide whether there was a sufficient factual basis to support the

vocational rehabilitation expert's opinion as to the plaintiff's vocational and educational attainment absent impairment. On a related note, we consider whether <u>Lewin Realty III, Inc. v. Brooks</u>, 138 Md. App. 244, 771 A.2d 446 (2001), <u>aff'd</u>, 378 Md. 70, 835 A.2d 616 (2003), and <u>Sugarman v. Liles</u>, 460 Md. 396, 190 A.3d 344 (2018) require an expert in a lead-based paint case to utilize statistical data or studies to support an opinion as to a plaintiff's vocational and educational attainment absent deficits. Lastly, we decide whether the trial court abused its discretion in denying a motion *in limine* to exclude the economic expert's testimony and report as untimely, and in admitting the economic expert's testimony.

We hold that the vocational rehabilitation expert's testimony, and, specifically, her opinion as to the plaintiff's vocational and educational attainment absent cognitive deficits, was supported by a sufficient factual basis, as required by Maryland Rule 5-702(3). Moreover, we determine that <u>Lewin Realty</u> and <u>Sugarman</u> do not establish a requirement that an expert in a lead-based paint case must utilize statistical data or specific studies to support an opinion as to a plaintiff's vocational and educational attainment absent deficits. A sufficient factual basis supporting an opinion as to a plaintiff's vocational and educational attainment absent deficits may be grounded in the expert's detailed and individualized assessment of information about the plaintiff, coupled with the expert's experience and training, as was the circumstance here. As such, we conclude that the trial court did not abuse its discretion in admitting the vocational rehabilitation expert's testimony and, in turn, admitting the economic expert's testimony. Finally, we hold that the trial court did not abuse its discretion in denying a motion *in limine* to exclude the

economic expert's testimony and report as untimely, and in admitting the economic expert's testimony at trial.

## BACKGROUND

### The Residential History

Daquantay Robinson ("Respondent")[1] alleged that he suffered lead-based paint poisoning while residing at a row house located at 1642 East 25th Street in Baltimore City ("the Property"). Although no issue concerning lead hazards at the Property or Respondent's exposure to lead at the Property is before us, for completeness, we include a brief summary of Respondent's residential and medical history.

On February 11, 1997, Respondent was born. Shortly before his birth, Respondent's mother, Tiesha Robinson, grandmother, Sandra Moses, and three other family members began residing in the Property, which, at all relevant times, was owned and managed by Elliot Dackman, the Estate of Sandra Dackman, and the Estate of Bernard Dackman (together, "Petitioners").[2] From his birth until July 2001, Respondent resided at the Property. For approximately the first eighteen months of his life, Respondent did not spend

---

[1]Although this case's caption in this Court is Elliot Dackman, et al. v. Daquantay Robinson, et al., Daquantay Robinson is the only Respondent. When the complaint was filed in the circuit court, Respondent was a minor, and the plaintiff was identified as "Daquantay Robinson, a minor, by his next friend, Tiesha Robinson." And, in the Court of Special Appeals, the case was captioned as Elliot Dackman, et al. v. Daquantay Robinson, a Minor, by his Mother and Next Friend, Tiesha Robinson.

[2]In the complaint filed in the circuit court, Respondent alleged that, at all relevant times, "Elliot Dackman, Individually and as Trustee of the Assets of The Dackman Company and Jacob Dackman & Sons, LLC, and Decedents, Sandra Dackman and Bernard Dackman, were the owners, and through their agents and employees, in control of the" Property, and that they "managed, maintained, operated and controlled the [P]roperty[.]"

- 3 -

any significant amount of time at any other property.

In an affidavit that was filed as an exhibit to Respondent's memorandum in support of an opposition to a motion for summary judgment, Moses averred that, when the family first moved in, there was chipping, peeling, and flaking paint "all over the place[.]" Moses also averred that there was chipping, flaking, and peeling paint on the exterior of the Property—specifically, on the door, posts, and ceiling of the front porch. Similarly, at a deposition, Robinson testified that there was chipping, flaking, and peeling paint on the window frames, as well as on the heater in her bedroom. Robinson also testified that there was a hole in the wall in her bedroom, which Respondent would pick at.

Between 1997 and 2000, Respondent's blood-lead levels were tested on six occasions—December 3, 1997, May 13, 1998, November 11, 1998, June 11, 1999, February 18, 2000, and August 30, 2000—while he resided at the Property. On December 3, 1997, Respondent's blood-lead level was 12 micrograms per deciliter ("µg/dL"); on May 13, 1998, Respondent's blood-lead level was 13 µg/dL; on November 11, 1998, Respondent's blood-lead level was 12 µg/dL; on June 11, 1999, Respondent's blood-lead level was 14 µg/dL; on February 18, 2000, Respondent's blood-lead level was 9 µg/dL; and on August 30, 2000, Respondent's blood-lead level was 9 µg/dL.

In July 2001, Respondent and Robinson moved out of the Property.

On June 10, 2013, after litigation had commenced, Arc Environmental, Inc. conducted lead testing at the Property. Lead-based paint was detected on seven interior surfaces and two exterior surfaces. Specifically, lead-based paint was detected in the basement storage room on the door surface and door jam, and in the basement hallway,

door casing, threshold, headers, and ceiling. Lead-based paint was also detected on the exterior of the Property on the front porch post and ceiling.

**The Litigation**

On November 28, 2012, in the Circuit Court for Baltimore City, Respondent, by and through his mother and next friend, Robinson, filed a complaint and demand for jury trial against Petitioners for negligence, violations of the Maryland Consumer Protection Act, and negligent misrepresentation arising out of Respondent's alleged exposure to lead-based paint at the Property.

On January 30, 2013, the circuit court issued a scheduling order, which provided that discovery, including depositions of expert witnesses, was to be completed by May 10, 2014. The scheduling order established deadlines for discovery, including that Respondent was to "respond to all interrogatory requests concerning the findings and opinions of experts . . . no later than" August 7, 2013. Trial was scheduled to begin on September 9, 2014, and any motions *in limine* were to be filed no later than fifteen days before the first day of trial.

In a letter to Petitioners' counsel dated May 9, 2013, Respondent's counsel designated various expert witnesses, including vocational rehabilitation experts and economic experts. Respondent's counsel identified Estelle L. Davis, Ph.D., as one of the vocational rehabilitation experts, stating:

> [Dr.] Davis, [] Rehabilitation Counselor, . . . will review documents and reports and may conduct her own evaluation of [Respondent] and render an opinion as to the loss of earning capacity [Respondent] is expected to incur as a result of [his] exposure to lead and related injuries. Dr. Davis relies upon her education, training[,] and experience, as well as the Chartbook on Work

and Disability in the United States, dat[a] from the U.S. Census Bureau and the Dictionary of Occupational Titles[] in reaching [her] conclusions.

(Underlining in original). Respondent's counsel identified Richard J. Lurito, Ph.D., as one of five economic experts, stating:

> Dr. Lurito is an expert economist who, based upon his review of the records and the vocational assessment of [Respondent], is expected to render an opinion regarding the loss of future earning capacity [Respondent] has suffered as a result of the injuries due to lead poisoning. He will quantify, in a present dollar amount, how much of an economic loss [Respondent] is expected to suffer over [Respondent]'s expected lifetime. Dr. Lurito relies upon his education, training[,] and experience in the field of economics in reaching his conclusion.

In an answer to an interrogatory, Respondent again identified various expert witnesses, including Dr. Davis and Dr. Lurito.

In a letter dated July 9, 2014, Dr. Davis evaluated Respondent's "employability and earning capacity given his impairments and absent his impairments." Dr. Davis noted that she had been provided several records from Respondent's file, including a report regarding a neuropsychological evaluation by Barry A. Hurwitz, Ph.D.,[3] which Dr. Davis summarized as follows:

> In the summary of his report[,] Dr. Hurwitz states that [Respondent]'s performances were impaired on neuropsychological measures of attention and executive functions, visual/spatial and visual/motor skills, motor abilities and memory. There were no indications that negative influences due to

[3]On April 17, 2013, Dr. Hurwitz evaluated Respondent. In his report, Dr. Hurwitz concluded that Respondent's "performances were impaired on neuropsychological measures of attention and executive functions [], visual/spatial and visual/motor skills [], motor abilities [] and memory[.]" Dr. Hurwitz reported that Respondent's "IQ scores were Low Average []; reading was Average to Low Average; and, written math was Borderline Impaired[.]" And, according to Dr. Hurwitz, "[t]here were no indications that negative influences due to emotional factors, fatigue[,] or loss of interest played a significant role during his presentation."

- 6 -

emotional factors, fatigue[,] or loss of interest played a significant role during his presentation.

Dr. Davis concluded that, "given his impairments, [Respondent] will graduate from high school[,]" and that "[g]iven his Low Average IQ, and his impairments in Attention and in Executive Functions, he will likely do best with a job that is routine and repetitive." Dr. Davis also stated that, "[a]ssuming that [Respondent] can control his anger, his earnings are likely to be equivalent to the lower range of someone with a high school education." Dr. Davis determined, however, that if Respondent's "anger continue[d] to be problematic[,] his earnings are likely to be equivalent to someone with less than a high school education." Dr. Davis observed that Respondent would like to attend college, but that "he would likely need to complete non[-]credit courses before qualifying to take college[-]level coursework." And, according to Dr. Davis, "considering [Respondent's] past academic performance[,]" it was "not likely" that Respondent would "be successful in completing college beyond the prerequisite coursework."

Dr. Davis concluded that, on the other hand,

[a]bsent his impairments[, Respondent] would likely function at a higher cognitive level. He would likely not have issues with Attention and Executive Functions. His school attendance and interest in school would be as it is now, and he would have more control over his temper. His grades in academic subjects would likely be higher.

Dr. Davis concluded that, "absent his impairments[, Respondent] would finish two year[s] of college or the equivalent in a technical school, and have earnings comparable to someone with that level of education." Dr. Davis's letter was forwarded to Petitioners' counsel as an attachment to a letter dated July 14, 2014, from Respondent's counsel. On August 15,

2014, Dr. Davis was deposed.

In July 2014, Dr. Lurito prepared a report entitled "Present Value of Lost Future Earnings of [Respondent]."[4] In the first sentence of the report, Dr. Lurito stated that the purpose of the assessment was "to determine the economic value [] of the projected lost earnings of [Respondent] as a result of his cognitive deficits[,] which," he had been "advised by Dr. [] Davis, a rehabilitation counselor, have reduced [Respondent's] earning capacity." Throughout the report, Dr. Lurito relied on Dr. Davis's opinion. In the report, Dr. Lurito identified "two important aspects" concerning "the economic value today of [Respondent]'s projected lost earnings": (1) "a projection must be made of his probable future earnings, absent and given deficits"; and (2) "a single lump-sum must be determined[,] which would be equivalent to his lost future earnings year after year over his expected working life[,]" and that lump-sum would be "equal to the so-called 'present value' of the individual's lost future earnings." Dr. Lurito concluded that, "absent deficits, [Respondent] had the capacity to earn an income of $2,862,509 in present value terms, if he had earned the income of the typical male with an Associate's degree in the United States as Dr. Davis opined."

Dr. Lurito noted that Dr. Davis had "opined that[,] given deficits [Respondent] may be able to earn what the typical male earns with a high school education in the low average range, if he can control his anger." Dr. Lurito concluded that, in that case, Respondent "would earn $1,714,201." Dr. Lurito reported that, if he was not able to control his anger,

---

[4]The report is dated "July 2014" and does not specify the date on which it was prepared.

Respondent's "earnings would be $1,186,732, based on the earnings of males with less than a high school education." As such, Dr. Lurito determined that Respondent "has likely suffered an income loss of $1,148,308 or $1,675,777 due to his cognitive deficits ($2,862,509 - $1,714,201[,] or $1,186,732)." And, Dr. Lurito stated that "a lump-sum payment of $1,148,308 or $1,675,777 needs to be made to [Respondent] to compensate him for the pecuniary loss he has suffered owing to his deficits." Dr. Lurito noted, though, that the lost earnings figures did "not include any medical and medical-related costs that [Respondent] has had to incur to date due to injury, nor [did they] reflect the cost of the medical and medical-related care he may incur in the future." In a letter to Petitioners' counsel dated July 29, 2014, which was both mailed and faxed, Respondent's counsel stated that he had attached Dr. Lurito's report.

In a motion *in limine*,[5] Petitioners sought to exclude the reports and testimony of Dr. Davis and Dr. Lurito, contending that Dr. Davis was "not qualified to make the medically based assumptions which form[ed] the core of her opinions[,] and[,] therefore, the[] assumptions lack[ed] an adequate factual basis and depend[ed] upon an unreliable methodology." (Cleaned up). Specifically, among other things, Petitioners argued that Dr. Davis lacked an adequate factual basis to offer an opinion as to Respondent's employment capabilities absent lead exposure, stating:

> Despite the fact that Dr. Davis is being offered as a vocational

_____

[5]On July 22, 2014, Petitioners filed a motion for summary judgment, contending that Respondent failed to establish the elements of negligence, violations of the Maryland Consumer Protection Act, and negligent misrepresentation. The circuit court granted the motion as to the claims for violations of the Maryland Consumer Protection Act and negligent misrepresentation, but denied the motion as to the claim for negligence.

rehabilitation expert, and not a medical expert, she is, in effect, offering a medical opinion regarding [Respondent]'s alleged pre-injury cognitive ability and earning capacity. Dr. Davis cannot logically make this unsupported assumption (i.e.[,] that the minor [Respondent] would have had the potential, absent injury, to function at the level of one holding a two[-]year associate[] degree) without possessing, at a bare minimum: (a) detailed medically based knowledge of [Respondent]'s pre-morbid cognitive state prior to the alleged injury; and (b) a medical expert's understanding of the nature and extent of [Respondent]'s present alleged cognitive impairments. In fact, Dr. Davis conceded that she had not even reviewed the report of [Respondent]'s primary medical expert.

Petitioners requested that "Dr. Davis'[s] report and testimony regarding [Respondent]'s future employability and loss of earning claim [] be excluded." Petitioners asserted that, because "Dr. Lurito's report, opinions[,] and calculations of [Respondent]'s alleged economic loss" relied on Dr. Davis's opinion, Dr. Lurito's report and testimony should also be excluded.

On August 28, 2014, Petitioners filed a motion *in limine* to exclude Dr. Lurito's report and testimony as untimely. According to Petitioners, although Respondent's answers to interrogatories identified Dr. Lurito as a potential economic expert, his answers "failed to provide the substance of Dr. Lurito's opinions[,]" which Petitioners did not obtain until they received Dr. Lurito's report on August 4, 2014, the date of the pretrial conference. Petitioners contended that, by that date, Respondent's "vocational rehabilitation expert had already been deposed, [Petitioners'] experts had already reached their conclusions and issued [] reports, and the depositions of any experts who had not yet been deposed had been scheduled." Petitioners argued that Dr. Lurito's report was produced after the discovery deadline, in violation of the circuit court's scheduling order, and that they suffered prejudice as a result.

From September 15 to 19, 2014, the circuit court conducted a jury trial. On the first day of trial, the circuit court heard argument on the various motions *in limine*, including the motions as to the reports and testimony of Dr. Davis and Dr. Lurito, and denied the motions. As to the motion to exclude Dr. Lurito's report and testimony as untimely, Petitioners' counsel contended that, because Petitioners had not timely received an economic report from Respondent, Petitioners had not designated their own economic expert. The circuit court denied the motion, and ruled that it was not going to deny Respondent "use of the expert when, under the circumstances, it was listed and noted far before the date that we're referring to." The circuit court observed that, although Petitioners received Dr. Lurito's report weeks before trial, Dr. Lurito was listed on Respondent's expert designation, and Petitioners failed to depose Dr. Lurito or request a postponement after they received his report on August 4, 2014. The circuit court, however, offered to permit Petitioners to take the deposition of Dr. Lurito that day and to designate their own economic expert. Petitioners' counsel stated that he would like to take Dr. Lurito's deposition, but he said nothing about designating an economic expert for Petitioners.

As to the motion *in limine* to exclude the reports and testimony of Dr. Davis and Dr. Lurito, after hearing brief argument from the parties, the circuit court denied the motion, ruling: "[I]t appears that [Dr. Davis] would be qualified as an expert. She will be allowed to give her opinion as an expert. This area is subject to cross-examination and attack as her opinions become[] a question for the trier of fact, based on the credibility questions raised by opposing counsel."

At trial, without objection, the circuit court accepted Dr. Davis as an expert "in the area of vocational rehabilitation counseling." Dr. Davis testified that she earned a Ph.D. in rehabilitation counseling, and has been a certified vocational rehabilitation counselor since the late 1970s. Dr. Davis explained that a vocational rehabilitation counselor "works with individuals to help them find employment, generally, or to identify employment or to evaluate them to help them make decisions on employment." Dr. Davis estimated that she has conducted at least 100 vocational evaluations of young adults. Dr. Davis testified that, generally, "the purpose of [an] evaluation is to help to set some idea of what the earning capacity of the person is." According to Dr. Davis, as part of such an evaluation, a vocational rehabilitation counselor assesses an individual's educational background, including whether the individual has "some interest in pursuing further education," as well as "medical records to understand [] the nature and extent of any impairments that the individual may have and to find out how permanent that is." Dr. Davis testified that a vocational rehabilitation counselor also looks at an individual's work history or background. In a case where there is no work history, a vocational rehabilitation counselor would "look [] more at family issues, the social issues, at their maturity, at their school records[, a]nd . . . there might be testing that's already been done, and sometimes psychological reports."

As to her vocational evaluation of Respondent, Dr. Davis testified that she had met with Respondent and Robinson, and had reviewed Respondent's "Answers to Interrogatories, [Respondent]'s deposition transcript, [Robinson]'s deposition transcript," Dr. Hurwitz's neuropsychological report, hospital records, Baltimore City Public School

records, and a report from Petitioners' pediatric neurology expert, Joseph M. Scheller, M.D.

Relying on Dr. Hurwitz's report, Dr. Davis testified that Respondent has "some neuropsychological problems that are ongoing and have stood in the way of his school progress and will likely be in the way of his vocational progress." Dr. Davis noted that Dr. Hurwitz found that Respondent has problems with executive function, which is "the part of the brain that helps you organize and to multitask and to put things in order." Dr. Davis also observed that Dr. Hurwitz determined that Respondent "has problems with attention[,]" and that Respondent "can't focus long enough on something to be able to carry through." According to Dr. Davis, Dr. Hurwitz's academic testing demonstrated that Respondent has poor reading comprehension, and that "[h]e can [only] do math at the level for . . . social survival[.]"

Dr. Davis testified that, in completing a vocational evaluation of an individual who has no work history, like Respondent, it is customary for a vocational rehabilitation counselor to "look at . . . the likely educational attainment of the individual, rather than citing specific jobs that they might do." Examining Respondent's academic records, Dr. Davis explained that Respondent's "academic progress has not been good[,]" and that his grade point average for tenth grade was 0.17. Dr. Davis observed that Respondent's academic records showed that he "had some problems with behavior, not being able to sit still, not focusing." Over objection, Dr. Davis expressed the opinion that, at the time she wrote her report, she "felt that [Respondent] would get his high school diploma, but he would likely have to do the bridge program, which is an alternative doing projects instead

- 13 -

[of] doing the Maryland Achievement Test." Dr. Davis explained that, generally, an individual must pass the High School Assessments "in order to get their high school diploma," and, if an individual cannot "make the score, then they can apply to do . . . a bridge project in whatever subject they're weak in." According to Dr. Davis, Respondent had taken the High School Assessments, "[b]ut he had not quite made . . . passing scores at that point in any of them." Dr. Davis testified that, thus, Respondent may be able to complete a bridge project to graduate.

Dr. Davis testified to a reasonable degree of vocational probability that Respondent would not have the academic and intellectual competency of a high school graduate. Dr. Davis explained that Respondent "will be in unskilled or low-level semi-skilled jobs[,]" and would have the earning capacity of "someone with less than a 12th grade education[.]" Dr. Davis testified that Respondent's issues with executive function, focus, and anger would be problematic for his employability, "even in the most simple jobs[.]"

Respondent's counsel asked Dr. Davis whether she had "an opinion to a reasonable degree of vocational probability as to what [Respondent]'s earnings would have been absent his cognitive deficits, [what] his earning capacity would have been absent his cognitive deficits[.]" Petitioners' counsel objected, and the circuit court conducted a bench conference. Petitioners' counsel contended that Dr. Davis was being asked to give a medical opinion even though she is not a medical doctor, and that such an opinion would be "tensely speculative." The circuit court sustained the objection as to the form of the question, but ruled that "the basis for the question [was] properly laid." The circuit court explained:

As she relies on Dr. Hurwitz and others as to their testing, she may rely on medical information and their results. She may rely on statistics and data given to her by other sources and governmental agencies. In so doing, is that her expertise is applying that information to the facts of the individual presented before her.

Then in terms, she's allowed to give her opinion as to that data, information, in her field. She has been, in fact, qualified as an[] expert, and she's allowed to utilize the information referred to. It is not that she's a medical doctor.

She is, however, expected and as an expert to review information and take into consideration that which would be from medical doctors in terms of her opinion and apply it to her interpretation.

So let's not misunderstand is that the fact she's not a doctor does not allow her to take into consideration is that Johnny has [a] heart problem and cannot be a fullback from the Ravens, as her opinion. That is not her being a doctor. That is her interpretation of the data and information and applying it to the person before her.

The circuit court stated that the "credibility and the weight that should be given [to Dr. Davis's opinion] is a matter of cross-examination."

Thereafter, the following exchange occurred:

[RESPONDENT'S COUNSEL:] Doctor, based on your education, training, experience, and the documents that you reviewed in this case, do you have an opinion to a reasonable degree of vocational probability as to what [Respondent]'s educational attainment would have been, absent his cognitive deficits?

[DR. DAVIS:] Yes, I do.

[RESPONDENT'S COUNSEL:] And what is that opinion?

[DR. DAVIS:] He would at least have completed high school. And I think looking at some of the IQ scores from Dr. Hurwitz, he had a verbal IQ of 89, which is -- that's -- the verbal IQ score is considered to be the best indicator of academic achievement.

And absent his cognitive issues, I think it would be likely that he could also go to a vocational tech school or a community college where he would learn some type of . . . hands-on work.

Dr. Davis testified that Respondent's "lack of focus and [] lack of attention . . . ha[d]

- 15 -

interfered with his schooling[,]" but his school records indicated that, "once he's focused, he can do something."

Without objection, the circuit court accepted Dr. Lurito as an expert.[6] Dr. Lurito testified that he has a Ph.D. in economics, and that he conducts "economic loss studies for individuals who are hurt in one way or the other or corporations that may be harmed." Dr. Lurito testified that, in forming an opinion as to the amount of loss of Respondent's future earning capacity, he relied on Dr. Davis's conclusions about Respondent's vocational probabilities with deficits and absent deficits, as well as general statistical data published by the United States Department of Labor, the United States Census Bureau, and the United States Social Security Administration. Based on this information, Dr. Lurito testified that the present value of earnings for an individual with some college education—*i.e.*, Respondent's earning capacity absent deficits—was $2,787,434. By contrast, Dr. Lurito testified that the present value of earnings for a "below[-]average high school graduate"— *i.e.*, Respondent's earning capacity with deficits—was $1,714,201. Calculating the difference between these two figures, Dr. Lurito rendered an opinion to a reasonable degree of economic probability that Respondent's loss of earning capacity was $1,073,042.[7]

At the conclusion of Respondent's case-in-chief, Petitioners moved for judgment

---

[6]Neither Respondent's counsel nor the circuit court specified a field when offering and admitting, respectively, Dr. Lurito as an expert. That said, while Respondent's counsel elicited his qualifications, Dr. Lurito testified that trial courts in "several [S]tates across the county" had admitted him as an expert in economics "[p]robably a thousand times[,] at least."

[7]The difference between $2,787,434 and $1,714,201 is actually $1,073,233, not $1,073,042.

on the only remaining claim (negligence), contending that Respondent had failed to establish a lead hazard at the Property during the time that he resided there. The circuit court denied the motion, ruling that, viewing the evidence in the light most favorable to Respondent, there was "testimony and documentary evidence that establishes the evidence of flaking, peeling paint in the [P]roperty during the course of the occupancy[,]" as well as "testimony as [to] lead[-based] paint levels existing in and during the time of the occupancy." Petitioners made a partial motion for judgment as to Respondent's economic loss claim, contending that Dr. Lurito's opinion was "premised on" Dr. Davis's letter, and that Dr. Davis's testimony lacked an adequate foundation. Petitioners' counsel reiterated the argument that Dr. Davis offered "a medical analysis that she [was] not competent to make." The circuit court denied the motion, ruling:

> [T]aking into consideration the facts and circumstances is that the witness need not have had all of that information in her grasp to have opined in light of her experience as a vocational counselor and expert. And, therefore, the arguments being made are one[s] that can reasonably be made and argued to the trier of fact that go[] to the credibility, but not disqualification of her as such.

(Paragraph break omitted).

Petitioners called experts who testified, among other things, that Respondent is not cognitively impaired; that Respondent "has the capability to go to college [and] get a decent job"; that there was no "evidence that [Respondent had] suffered any neurological, developmental, or cognitive intelligence deficit or injury related to his lead levels at age two or so"; that Respondent is capable of "maintaining gainful employment in a semi-skilled to skilled job" and "will not experience an earning capacity loss or . . . a reduced

work-life expectancy"; and that "analytical results" did not "indicat[e] or suggest[] the presence of a lead hazard" in the Property during the period that Respondent resided there. And, at least one expert questioned the reliability of Respondent's medical expert's opinion regarding the degree to which lead-based paint caused Respondent to suffer an IQ loss. That expert testified that there are other sources of lead exposure for children besides lead-based paint, such as dirt, dust, water, canned food, and secondhand smoke.

After the close of Petitioners' case, Petitioners renewed the motion for judgment as to the negligence claim and the motion for partial judgment as to "the economic loss component of the case." The circuit court again denied the motions. As to the motion for partial judgment, the circuit court observed "that[,] based on the qualifications submitted and testimony[,] there is no basis . . . to disqualify [Dr. Davis] and her testimony[,]" and that the jury was to decide the credibility and weight to be given to her testimony. The circuit court instructed the jury, counsel made closing arguments, and the jury deliberated. On September 19, 2014, the jury returned a verdict in Respondent's favor as to negligence, and awarded him $1,270,000 in economic damages and $818,330 in non-economic damages.

On September 29, 2014, Petitioners filed a motion for remittitur of the economic and non-economic damages, and a motion for judgment notwithstanding the verdict and/or motion for new trial. Petitioners again contended that Dr. Lurito's report was untimely because it was disclosed after the discovery deadline. Petitioners argued that the jury's award for economic damages should be reduced to $0 "in light of the disclosure violation concerning Dr. Lurito's opinions and/or the lack of foundation of Dr. Davis['s] and Dr.

Lurito's opinions[.]" (Cleaned up). Petitioners asserted that the economic damages award should be reduced to $0 or stricken because, according to Petitioners, the award was not supported by the evidence and the jury had speculated in making the award. Petitioners also contended that the jury's award for non-economic damages should be reduced to $530,000 pursuant to Maryland's cap on non-economic damages.

In the motion for judgment notwithstanding the verdict and/or motion for new trial, Petitioners contended that, "the evidence, even in a light most favorable to [Respondent], [did] not establish that [Petitioner]s were negligent[.]" Specifically, Petitioners argued that Respondent "did not meet his burden of demonstrating the existence of any lead-based paint hazards at the [P]roperty[,]" and that he did not "demonstrate that he sustained any injuries [that were] proximately caused by any [] breach of duty." Additionally, Petitioners asserted that Respondent had failed to establish economic damages.

On November 3, 2014, the circuit court held a hearing on the motions. At the conclusion of the hearing, the circuit court denied the motion for judgment notwithstanding the verdict and/or motion for new trial. The circuit court granted in part the motion for remittitur, reduced the award of economic damages to $1,000,000, and reduced the award of non-economic damages to $530,000 pursuant to Maryland's cap on non-economic damages. In doing so, the circuit court implicitly denied Petitioners' request to reduce the award of economic damages to $0. The circuit court observed that it had "attempted to allay whatever, not just misgivings, but to offset any imbalance of that to say the [circuit c]ourt was willing to order [Dr. Lurito's] deposition to be had before he testified." The circuit court also noted that it had inquired of Petitioners' counsel "whether or not [he]

planned now to have an economist." The circuit court stated that, "under the circumstances, however, the cross-examination was extensive and is, as such, sufficient . . . to raise the issues that you would have argued, notwithstanding the delay in the name or whether or not you chose to have an economist."

On November 5, 2014, the circuit court issued an order granting the motion for remittitur, ordering that the award of non-economic damages be reduced from $818,300 to $530,000, and that the award of economic damages be reduced from $1,270,000 to $1,000,000. On the same date, the circuit court issued a separate order denying the motion for judgment notwithstanding the verdict and/or motion for new trial.

### Opinion of the Court of Special Appeals

Petitioners appealed. On August 31, 2018, in an unreported opinion, the Court of Special Appeals affirmed the circuit court's judgment. See Elliot Dackman, et al. v. Daquantay Robinson, a Minor, by his Mother and Next Friend, Tiesha Robinson, No. 2035, Sept. Term, 2014, 2018 WL 4190963, *2 (Md. Ct. Spec. App. Aug. 31, 2018). As to the admissibility of Dr. Davis's and Dr. Lurito's testimony, relying on Sugarman, 460 Md. 396, 190 A.3d 344, and Lewin Realty, 138 Md. App. 244, 771 A.2d 446, the Court of Special Appeals held as follows:

> Taking *Sugarman* and *Lewin Realty* together, we conclude that Dr. Davis's opinion regarding [Respondent]'s probable educational achievement and vocational capability absent lead impairments was based on a sufficient factual basis. Accordingly, Dr. Davis's testimony was admissible under [Maryland] Rule 5-703(3), and the circuit court did not abuse its discretion by admitting Dr. Davis's testimony into evidence.

> Finally, [Petitioner]s' sole challenge to Dr. Lurito's testimony was that it was based on Dr. Davis's conclusions, which, according to

- 20 -

[Petitioner]s, lacked a sufficient factual basis. Because we conclude that Dr. Davis's testimony was admissible, it follows that Dr. Lurito's testimony was admissible as well.

Dackman, 2018 WL 4190963, at *19. In so holding, the Court of Special Appeals explained:

> Dr. Davis interviewed [Respondent] and his mother, reviewed Dr. Hurwitz's neuropsychological report, and reviewed [Respondent]'s medical and educational records. Dr. Davis also relied on her experience of having worked as a vocational rehabilitation counselor for over 30 years during which she has assessed and helped over 100 young adults. After reviewing this data, Dr. Davis concluded that [Respondent] would not have the academic and intellectual competency of someone with a high school diploma because of his problems with executive function and focus that were identified by Dr. Hurwitz. Having reviewed [Respondent]'s academic records, Dr. Davis further stated that, in her expert opinion, [Respondent] would have been able to earn a high school diploma and attend "a vocational tech school or a community college where he would learn some type of . . . hands-on work[,]" without his disabilities. Through this testimony, Dr. Davis adequately explained that [Respondent] had sustained a loss of earning capacity as a result of his injuries. Specifically, with his injuries, he would have the earning capacity of someone with a high school diploma, and without his injuries, he would have the earning capacity of someone with a high school diploma and some college education. Therefore, Dr. Davis's detailed and individualized analysis provided a sufficient factual basis for her to opine about [Respondent]'s vocational potential with deficits and without deficits.

Id. at *17.

The Court of Special Appeals rejected Petitioners' contention "that Dr. Davis's opinion lacked a sufficient factual basis because she did not rely on general statistical data in determining [Respondent]'s vocational potential absent his deficits." Id. at *18. The Court of Special Appeals concluded that, although "[t]he quantification of the loss between the earning capacity absent deficits and with deficits[] must be based on general statistical data[,]" "the determination that an individual would have obtained a higher degree of

- 21 -

education absent deficits does not need to be based on general statistical data." Id. (emphasis omitted). The Court of Special Appeals explained that "[t]hat is exactly what happened here." Id.

The Court of Special Appeals held that the circuit court did not abuse its discretion in denying the motion *in limine* to exclude Dr. Lurito's report and testimony as untimely. See id. at *20. The Court of Special Appeals explained:

> [T]he [circuit] court denied [Petitioners]' motion *in limine*, because once they received Dr. Lurito's report, either on July 29, 2014, or August 4, 2014, they took no action, despite taking depositions throughout the month of August of other experts designated by [Respondent]. Specifically, the [circuit] court stated that "[t]he fact that there was a report received, and no action from your office, based on the report, the request for postponement should have been filed then." The [circuit] court explained that "no action was taken to resolve the discovery problem[,]" and no action was taken to suggest that they were doing "everything [they] could to go forward on this issue." With [Petitioner]s having waited until close to trial to raise the issue, the [circuit] court denied [Petitioner]s' motions to exclude and for a postponement. The [circuit] court did, however, fashion a remedy for the late disclosure by allowing [Petitioner]s to designate their own expert economist and giving them the opportunity to depose Dr. Lurito on the first day of trial. Taking all of these considerations together, we cannot say the [circuit] court's action was a clear abuse of discretion.

Id. (some alterations in original).

The Court of Special Appeals observed that Petitioners contended that they were prejudiced due to the late disclosure of Dr. Lurito's report for the first time in their reply brief. See id. at *21. Noting that "an appellate court ordinarily will not consider an issue raised for the first time in a reply brief[,]" the Court of Special Appeals determined that, even if it considered Petitioners' prejudice argument, it "would still conclude that the circuit court did not abuse its discretion." Id. (cleaned up). The Court of Special Appeals

observed that, based on the record, Petitioners had "not demonstrate[d] that they were prejudiced by the late disclosure and subsequent admission of Dr. Lurito's testimony at trial." Id.

**Petition for a Writ of *Certiorari***

On November 1, 2018, Petitioners petitioned for a writ of *certiorari*, raising the following two issues:

> I.     Did [the Court of Special Appeals], in upholding the admission of testimony of [Dr.] Davis, [] fail to follow the appropriate standards elucidated in *Lewin Realty III, Inc.* [] and *Sugarman* []?
>
> II.     Does it violate fundamental due process and fairness, and is it a miscarriage of justice, for a [t]rial [court] to *sua sponte* amend the [s]cheduling [o]rder solely to the benefit of one party, and extend Respondent's expert designation deadline by over a year, while simultaneously denying Petitioners' request to amend their own expert deadline, extend the discovery deadline[,] and postpone the trial to alleviate the prejudice?

On December 13, 2018, this Court granted the petition. See Dackman v. Robinson, 462 Md. 82, 198 A.3d 218 (2018).

**DISCUSSION**

**I.**

**The Parties' Contentions**

Petitioners contend that the circuit court abused its discretion in permitting Dr. Davis to testify, and that, in affirming the circuit court's ruling, the Court of Special Appeals "failed to follow the guidance" of Sugarman, 460 Md. 396, 190 A.3d 344, and Lewin Realty, 138 Md. App. 244, 771 A.2d 446. Petitioners argue that Dr. Davis lacked an adequate factual basis for her opinion as to Respondent's vocational and educational

- 23 -

attainment absent impairment because she failed to use studies or statistical data, or identify any source supporting her opinion. Petitioners point out that Dr. Davis failed to perform any vocational testing, and instead relied solely upon Dr. Hurwitz's neuropsychological report to determine Respondent's vocational and educational potential. Petitioners maintain that "the Court of Special Appeals improperly restricted the holding[s] in" Sugarman and Lewin Realty by concluding that the quantification of economic values alone requires the use of statistical data.

Petitioners contend that Dr. Davis's opinion lacked an adequate factual basis because she failed to utilize a reliable methodology for analyzing data. Petitioners argue that, absent a reliable methodology, Dr. Davis's opinion amounted to speculation. Petitioners assert that, as such, the circuit court abused its discretion in admitting Dr. Davis's opinion and permitting Dr. Lurito to offer his opinion, which was based on Dr. Davis's opinion. Petitioners request that we either remand this case to the circuit court for a new trial, with instruction to preclude Respondent from offering expert testimony as to what his vocational and educational attainment would be absent impairment, or, in the alternative, remand this case to the circuit court with instructions to vacate its judgment, strike the economic damages award, and enter a new judgment for the amount of non-economic damages awarded by the jury subject to the cap on non-economic damages, *i.e.*, $530,000.

Respondent counters that the Court of Special Appeals properly upheld the circuit court's admission of Dr. Davis's testimony, including the opinion as to Respondent's vocational and educational attainment absent impairment. Respondent asserts that the

Court of Special Appeals correctly concluded that Dr. Davis's opinion was supported by an adequate factual basis. Specifically, Respondent maintains that Dr. Davis performed a "detailed and individualized analysis [that] provided a sufficient factual basis for her to opine about [Respondent]'s vocational potential with deficits and without deficits."

Respondent contends that the Court of Special Appeals properly rejected Petitioners' argument that an expert must use general statistical data in determining an individual's vocational potential absent impairment. Respondent argues that the determination that an individual would have obtained a higher degree of education absent deficits need not be based on general statistical data, and that neither Lewin Realty nor Sugarman creates such a requirement. In sum, Respondent asserts that the Court of Special Appeals correctly held that Dr. Davis's opinion as to his probable educational achievement and vocational capability absent impairment was based on a sufficient factual basis, and, accordingly, the circuit court did not abuse its discretion in admitting Dr. Davis's testimony. Respondent maintains that, because Dr. Davis's testimony was admissible, Dr. Lurito's testimony was as well. Respondent contends that the quantification of the loss between the earning capacity absent deficits and with deficits must be based on general statistical data, and Dr. Lurito used such data in this case to quantify the amount of economic loss.

**Standard of Review**

"It is often said that decisions to admit or exclude expert testimony fall squarely within the discretion of the trial court." Levitas v. Christian, 454 Md. 233, 243, 164 A.3d 228, 234 (2017) (citation omitted). "[A]n abuse of discretion is discretion manifestly

unreasonable, or exercised on untenable grounds, or for untenable reasons." Id. at 243, 164 A.3d at 234 (cleaned up). Untenable "grounds include when a trial [court] exercises discretion in an arbitrary or capricious manner or when [it] acts beyond the letter or reason of the law." Id. at 244, 164 A.3d at 234 (cleaned up). And, in Roy v. Dackman, 445 Md. 23, 38-39, 124 A.3d 169, 178 (2015), we stated that "the admissibility of expert testimony is a matter largely within the discretion of the trial court, and its action in admitting or excluding such testimony will seldom constitute a ground for reversal." (Cleaned up).

### Expert Testimony

"Expert testimony is meant to assist the jury in resolving an issue outside the average person's realm of knowledge." Levitas, 454 Md. at 245, 164 A.3d at 235 (citation omitted). To that end, Maryland Rule 5-702 provides that "[e]xpert testimony may be admitted, in the form of an opinion or otherwise, if the court determines that the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." In making that determination, the trial court must assess three factors: "(1) whether the witness is qualified as an expert by knowledge, skill, experience, training, or education, (2) the appropriateness of the expert testimony on the particular subject, and (3) whether a sufficient factual basis exists to support the expert testimony." Md. R. 5-702.

As to the third factor, we have explained that "[e]xpert testimony must [] have an adequate factual basis so that it is more than mere speculation or conjecture." Id. at 246, 164 A.3d at 235 (cleaned up). "If an expert's conclusions are not supported by an adequate factual basis, his [or her] opinion has no probative force." Id. at 246, 164 A.3d at 236 (citation omitted). Indeed, "[t]he probative value of an expert's testimony is directly

related to the soundness of the reasons given for his [or her] conclusions." Id. at 246, 164 A.3d at 236 (cleaned up). As such, we have explained that an adequate factual basis requires two things—"(1) an adequate supply of data; and (2) a reliable methodology for analyzing the data." Id. at 246, 164 A.3d at 236 (citations omitted). Moreover, when "the facts or data that an expert relies on are of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, they need not be independently admissible at trial." Id. at 246, 164 A.3d at 236 (citation omitted).

Importantly, in assessing the three factors set forth in Maryland Rule 5-702, "the trial court is only concerned with whether the expert's testimony is admissible." Levitas, 454 Md. at 246, 164 A.3d at 236. As such, "[o]bjections attacking an expert's training, expertise[,] or basis of knowledge go to the weight of the evidence and not its admissibility." Id. at 246, 164 A.3d at 236 (cleaned up). "An expert's qualifications and methods may be teased out during cross-examination, and the jury can then assess how much weight to give his [or her] testimony." Id. at 246, 164 A.3d at 236 (citation omitted). And, significantly, "[e]ven if a witness is qualified as an expert, the fact[-]finder need not accept the expert's opinion[,]" i.e., the fact-finder is free to reject the expert's opinion and accord it little or no weight. Id. at 247, 164 A.3d at 236 (cleaned up).

### Lost Earning Capacity

Recently, in Sugarman, 460 Md. at 438, 190 A.3d at 368-69, we explained that a claim for lost earnings is distinct from a claim for lost wages, stating:

> Evidence in a wage loss claim reflects loss of specific opportunities, such as those represented by an existing job. Proof typically shows past wage and future prospects in the job, coupled with proof that the plaintiff can no longer

work or can work only part time. For example, evidence might show that the plaintiff was studying to become an engineer and because of his injury he could no longer master the materials, or general capacity for advancement which has been limited by the injury. In either kind of claim, the evidence must be sufficient to permit a reasonable estimate of the loss claimed.

(Cleaned up). We observed that, in a personal injury action, such as a claim for negligence in a lead-based paint case, "a plaintiff must prove that injury and damages were proximately caused by the negligent acts of the defendant[,]" and such "[d]amages must be actual, not speculative, remote, or uncertain." Id. at 439, 190 A.3d at 369 (citations omitted). As to "claims for lost earning capacity, 'since the extent[,] and hence the value, of future earning power[] depends on probabilities, and cannot be reduced to even a reasonable certainty, the courts should—and do—scan with much more charitable eyes[] the sufficiency of proof of this item of damage[.]'" Id. at 440, 190 A.3d at 369 (quoting McCormick, *Handbook on the Law of Damages* § 27, at 101-02 (1931)).

### **Lewin Realty and Sugarman**

In Lewin Realty, 138 Md. App. at 255, 279, 285, 771 A.2d at 452, 466, 470, a lead-based paint case, in *dicta*, the Court of Special Appeals addressed, in relevant part, whether the trial court improperly permitted a witness to testify as a vocational rehabilitation expert,[8] and stated that the trial court did not abuse its discretion in determining that the

---

[8]In Lewin Realty, 138 Md. App. at 254-55, 771 A.2d at 452, the Court of Special Appeals held that the trial court erred in admitting into evidence lead-based paint violation notices pertaining to other properties, and concluded that the error was prejudicial. As such, the Court of Special Appeals reversed the judgment in favor of the plaintiffs and remanded the case to the trial court for further proceedings. See id. at 254-55, 771 A.2d at 451-52. Nevertheless, the Court of Special Appeals addressed two other issues, including the expert witness issue, "for the guidance of the [trial] court on remand." Id. at 255, 771 (Continued...)

witness was qualified as an expert witness and had an adequate factual basis for his opinion. In that case, the plaintiffs designated an individual named Mark Lieberman as a vocational rehabilitation expert. See Lewin Realty, 138 Md. App. at 275, 771 A.2d at 464. Lieberman conducted an individualized assessment of the minor plaintiff in forming his opinion, considering a neuropsychological evaluation from Dr. Hurwitz, a medical report, the plaintiff's school and health records, and information provided by the plaintiff's mother and grandmother. See id. at 284, 771 A.2d at 469. Lieberman "also took into account [the plaintiff]'s achievement of developmental milestones and his mother's work and educational background." Id. at 284, 771 A.2d at 469.

The Court of Special Appeals observed that, utilizing this information and his expertise, Lieberman formed opinions as to the plaintiff's educational and vocational future, with and without deficits. See id. at 284-85, 771 A.2d at 469. Specifically, Lieberman opined "that, without the mental disabilities from lead exposure, it was probable that [the plaintiff] would have in the future attained an education level of between 9th and 12th grade, and would have been employable in jobs requiring organizational and oversight skills." Id. at 284-85, 771 A.2d at 469. Lieberman opined that, on the other hand, with deficits, "it was more likely than not that [the plaintiff] would drop out of school at the age of 16 and would not complete a 9th grade education, and that he only would be employable

---

A.2d at 452. This Court granted the plaintiffs' petition for a writ of *certiorari* "to clarify the notice requirement in lead[-based] paint poisoning negligence actions based upon violations of the Baltimore City Housing Code." Brooks, 378 Md. at 72, 835 A.2d at 617. This Court did not address any issue related to the admissibility of the vocational rehabilitation expert witness's testimony.

for 'very basic manual labor.'" Id. at 285, 771 A.2d at 469-70.

The Court of Special Appeals noted that, using general statistical data from the Department of Commerce, "Lieberman opined that [the plaintiff]'s earning capacity was less than what it would have been had he not been injured." Id. at 285, 771 A.2d at 470. The Court of Special Appeals thus stated that, despite the circumstance that the plaintiff

> had no work history or track record of employment, the combination of evidence specific to [him] and general to the population that was adduced at trial was such as to permit a reasonable finding that, more likely than not, [the plaintiff]'s future earning would be less than it would have been if he were not injured.

Id. at 285, 771 A.2d at 470. As such, the Court of Special Appeals stated that "[t]he evidence was reasonably certain and was not based on speculation or conjecture[,]" i.e., there was an adequate factual basis for Lieberman's opinion. Id. at 285, 771 A.2d at 470.

In Sugarman, 460 Md. at 445-46, 190 A.3d at 372-73, a lead-based paint case, this Court concluded that a vocational rehabilitation expert's opinion was supported by an adequate factual basis, and held that the plaintiff "set forth sufficient evidence of damages in the form of loss of earning capacity[,] and [that] the trial court correctly submitted the issue to the jury." In that case, the plaintiff designated Lieberman as his vocational rehabilitation expert. See id. at 406, 190 A.3d at 349. Lieberman conducted an assessment of the plaintiff by meeting with him and reviewing a neuropsychology report of the plaintiff, as well as his medical and educational records. Id. at 406, 190 A.3d at 350. Lieberman used the "RAPEL" methodology—"each letter in 'RAPEL' stands for a separate stage of the vocational rehabilitation analysis"—"administered the Career Ability Placement Survey[,]" and concluded that, although the plaintiff "had the skills of a high

school graduate, [Lieberman] anticipated that difficulties would arise for [the plaintiff] once he started college." Id. at 406-07, 190 A.3d at 350. Lieberman testified that the plaintiff had the "IQ potential and basic academics to be at least an Associate's degree graduate[,]" but, according to Lieberman, the plaintiff "would be unable to obtain that degree[,]" explaining:

> It's his ability to function in the college setting as the work gets more difficult. It's my expectation, I see [the plaintiff] as going to college, being able to pass some classes, but eventually hitting that brick wall—the point where he's not going to be able to get the Associate's degree. And what we see here is that [the plaintiff] is going to get up to the level of an individual with a high school diploma and some college, but won't eventually reach the earnings of an individual with at least an Associate's degree.

Id. at 407-08, 190 A.3d at 350 (cleaned up). Lieberman thus opined that the plaintiff would "not earn an Associate's degree and that, without the deficits caused by his exposure to lead, he would have earned a degree." Id. at 437, 190 A.3d at 368.

The plaintiff offered Michael Conte, Ph.D., as an expert in economics, and he testified about the plaintiff's damages as a result of loss of earning capacity. See id. at 408, 190 A.3d at 350. "Dr. Conte explained the concept of loss of earning capacity, which he described as the difference between 'how much you probably would have earned absent a certain impediment or insult versus how much you're likely to earn now.'" Id. at 408, 190 A.3d at 350. Dr. Conte opined that the plaintiff's lost earning capacity was $1,698,808, which represented the difference in earning capacity between someone with an associate's degree—$3,456,127 (the plaintiff's "likely earnings without any deficits")—and someone with a high school diploma and some college—$1,757,320 (the plaintiff's "likely earnings with deficits"). Id. at 409, 190 A.3d at 351. Dr. Conte opined that $1,698,808 represented

"the sustained loss of earnings resulting from [the plaintiff]'s injuries." Id. at 409, 190 A.3d at 351.

The jury returned a verdict in the plaintiff's favor, awarding $600,000 in non-economic damages and $702,610 in economic damages, and "[f]inal judgment was entered in the amount of $1,277,610 after a reduction consistent with the statutory cap on non-economic damages." Id. at 411, 190 A.3d at 352. The defendants appealed, contending, in pertinent part, that the plaintiff had failed to "sufficiently prove[] that his claimed injuries had resulted in any damages." Id. at 411, 190 A.3d at 352. The Court of Special Appeals affirmed the trial court's judgment, and this Court granted the defendants' petition for a writ of *certiorari*. See id. at 411, 190 A.3d at 352-53.

In this Court, the defendants contended that "Lieberman's opinion rested on the 'baseless' assumption that[,] without deficits, [the plaintiff] would have obtained an Associate's degree." Id. at 437, 190 A.3d at 368. We disagreed and held that "Lieberman's opinion was based on substantial material[,]" explaining:

> [Lieberman] interviewed [the plaintiff], conducted additional vocational testing, and reviewed his educational and medical records. He also reviewed and relied upon the neuropsychological evaluation and conclusions of Dr. Kraft. Additionally, Lieberman relied on his years of experience as a vocational rehabilitation counselor during which he has helped thousands of students attend college. After reviewing this data, he concluded that [the plaintiff] was not likely to receive a college degree due to the attention problems Dr. Kraft identified. He further proffered that, in his expert opinion, [the plaintiff] would have been able to earn a college degree without his disabilities. Dr. Conte, the economics expert, then testified regarding the financial earnings of an individual with a college degree versus those of an individual without a college degree.

Id. at 444, 190 A.3d at 372 (footnote omitted). We concluded that "[t]he combined

information offered by Lieberman and Dr. Conte presented a detailed and individualized analysis of [the plaintiff]'s employment prospects and future earnings." Id. at 445, 190 A.3d at 372-73. Indeed, the plaintiff "set forth an individualized analysis of his likely outcome coupled with statistical data to assist the jury in quantifying his damages." Id. at 445, 190 A.3d at 373. We, therefore, "conclude[d] that [the plaintiff] set forth sufficient evidence of damages in the form of loss of earning capacity and the trial court correctly submitted the issue to the jury." Id. at 446, 190 A.3d at 373.

In so holding, this Court applied the standards from, and relied on, Lewin Realty in determining that Lieberman's opinion was based on substantial material. See Sugarman, 460 Md. at 444, 190 A.3d at 372. And, we stated that, "[a]lthough an award for lost earning capacity is necessarily less certain than pecuniary damages in other contexts, we view[ed the plaintiff]'s evidence as similar to—if not stronger than—the evidence offered by the plaintiffs in" three prior cases, including Lewin Realty. Sugarman, 460 Md. at 445, 190 A.3d at 373.

We rejected the defendants' contention "that Lieberman's opinion was insufficient because he did not consider the educational and work history of [the plaintiff]'s parents." Id. at 445, 190 A.3d at 373. We explained that, "[a]lthough the Court of Special Appeals approved of such parental consideration in *Lewin Realty* and" another case, we did "not view those cases as [creat]ing a requirement that a vocational expert [] consider parental achievement when offering an opinion as to a plaintiff's pre-injury outcome." Id. at 446, 190 A.3d at 373 (emphasis omitted). And, we noted that the defendants provided "no authority" that indicated that such a requirement existed. Id. at 446, 190 A.3d at 373.

- 33 -

**Analysis**

Here, we hold that Dr. Davis's testimony, and, specifically, her opinion as to Respondent's vocational and educational attainment absent cognitive deficits—*i.e.*, that, absent cognitive deficits, Respondent would at least have completed high school and likely would have attended a vocational technical school or a community college where he would have learned hands-on work—were supported by a sufficient factual basis, as required by Maryland Rule 5-702(3). Moreover, we determine that Lewin Realty and Sugarman do not establish a requirement that an expert in a lead-based paint case must utilize statistical data or specific studies to have an adequate factual basis to testify as to a plaintiff's vocational and educational attainment absent deficits. Stated otherwise, a sufficient factual basis supporting an opinion as to a plaintiff's vocational and educational attainment absent deficits need not be predicated on statistical data, but instead may be grounded in the expert's detailed and individualized assessment of information about the plaintiff, coupled with the expert's experience and training. That was the case here. As such, we conclude that the circuit court did not abuse its discretion in admitting Dr. Davis's testimony and, in turn, admitting Dr. Lurito's testimony, which was based on Dr. Davis's opinions concerning Respondent's vocational and educational attainment with and without cognitive deficits.

Here, there was a sufficient factual basis to support Dr. Davis's opinions. Dr. Davis's detailed and individualized assessment of Respondent, coupled with her experience and training, provided a sufficient factual basis for her to opine about Respondent's vocational and educational attainment with and absent cognitive deficits. As

- 34 -

to her experience and training, Dr. Davis testified extensively about her professional background and how a vocational rehabilitation counselor conducts a vocational evaluation. Dr. Davis testified that she had a Ph.D. in rehabilitation counseling and had been a certified vocational rehabilitation counselor since the late 1970s. Dr. Davis testified that, over the course of her career, she had conducted at least 100 vocational evaluations of young adults, which consisted of working with individuals to help them find employment or identify employment, or make decisions as to employment, and to ultimately help the individuals understand their earning capacity. Dr. Davis explained that a vocational evaluation involves assessing numerous factors, including: an individual's educational background and whether the individual is interested in, and capable of, pursuing further education; the individual's medical records, and "the nature and extent of any impairments"; and the individual's work history or background, or, where employment history does not exist, the likely educational attainment of the individual; and, where there is no work history, the individual's "family issues[,] social issues[,] maturity[,] school records," any testing that had been completed, and psychological reports.

Dr. Davis testified in detail about her vocational assessment of Respondent. Dr. Davis testified that she met with both Respondent and his mother, and that she reviewed various documents, reports, and records, including Respondent's "Answers to Interrogatories, [Respondent]'s deposition transcript, [Robinson]'s deposition transcript," Dr. Hurwitz's neuropsychological report, hospital records, Baltimore City Public School records, and a report from Petitioners' pediatric neurology expert, Dr. Scheller. Dr. Davis then thoroughly explained what these documents, records, and reports demonstrated. For

example, relying on Dr. Hurwitz's report, Dr. Davis testified that Respondent has ongoing neuropsychological problems that have impeded his school progress and would likely impede his vocational progress. Dr. Davis also observed that Dr. Hurwitz found that Respondent has problems with executive function, attention, and focus. Dr. Davis further testified that academic testing revealed that Respondent has "poor" reading comprehension and that his math skills are at the basic level that is necessary for "social survival[.]"

As to Respondent's school records, Dr. Davis testified that Respondent's academic progress had not been good, that his grade point average for tenth grade was 0.17, and that Respondent had problems with behavior and focus. Dr. Davis testified that Respondent had taken the High School Assessments, which are generally needed to graduate, but that he had not earned a passing score on any of the tests. Dr. Davis explained that Respondent could possibly graduate by completing a bridge project, which is an alternative to passing the High School Assessments.

Based on her experience and background, including working as a vocational rehabilitation counselor for over thirty years and conducting vocational assessments of over 100 young adults, and after reviewing data specific to Respondent and conducting her own vocational evaluation of Respondent, Dr. Davis offered opinions to a reasonable degree of vocational probability as to Respondent's academic and intellectual capacity and his vocational and educational attainment both with and absent cognitive deficits. Specifically, Dr. Davis testified that, with deficits, Respondent would not have the academic and intellectual competency of a high school graduate, that he would work in unskilled or low-level semi-skilled jobs, and that he would have the earning capacity of "someone with less

- 36 -

than a 12th grade education[.]"  Dr. Davis explained that Respondent's issues with executive function, focus, and anger would be problematic for his employability, even in simple jobs.  Dr. Davis opined that, absent cognitive deficits, Respondent "would at least have completed high school[,]" and "it would be likely that he could also go to a vocational tech school or a community college where he would learn some type of . . . hands-on work."  Dr. Davis also opined that Respondent's "lack of focus and [] lack of attention . . . ha[d] interfered with his schooling[,]" but that his school records indicated that, "once he's focused, he can do something."  In short, Dr. Davis explained the differences between Respondent's vocational and educational attainment with and absent cognitive deficits, and there was a sufficient factual basis to support those opinions.[9]

Neither <u>Lewin Realty</u> nor <u>Sugarman</u> stands for the principle that a vocational rehabilitation expert's opinion lacks a sufficient factual basis where the expert does not rely on general statistical data in determining a plaintiff's vocational and educational potential absent deficits.  As an initial matter, importantly, in <u>Lewin Realty</u>, 138 Md. App. at 254-55, 771 A.2d at 452, the Court of Special Appeals's discussion of whether the trial court improperly permitted a vocational rehabilitation witness to testify as an expert was *dicta*, provided only for guidance to the trial court on remand, as the Court of Special Appeals reversed the trial court's judgment on a different issue.  As such, nothing in <u>Lewin Realty</u> concerning the vocational rehabilitation witness constitutes precedent, let alone

---

[9]In their brief, Petitioners note that, in the circuit court, they did not challenge Dr. Davis's ability to opine as to Respondent's educational and vocational attainment with deficits.

precedent that binds this Court. In any event, significantly, in observing that there was a sufficient factual basis for Lieberman's opinion, the Court of Special Appeals at no point set forth a requirement that such an expert rely on general statistical data in rendering an opinion as to a plaintiff's educational and vocational attainment with and absent deficits. See id. at 285, 771 A.2d at 470.

And, it is worth noting that Lewin Realty is factually distinguishable from this case in a key way—in Lewin Realty, id. at 284-85, 771 A.2d at 469-70, Lieberman acted as both a vocational rehabilitation expert and an economic expert, whereas, here, Dr. Davis was the vocational rehabilitation expert and Dr. Lurito was the economic expert. In Lewin Realty, id. at 284, 771 A.2d at 469, Lieberman testified that he conducted an individualized assessment of the plaintiff, considering various reports and records, as well as information that the plaintiff's mother and grandmother provided. Using this information, Lieberman offered opinions as to the plaintiff's educational and vocational potential, with and without deficits. See id. at 284-85, 771 A.2d at 469-70. Specifically, Lieberman opined that, without deficits, the plaintiff probably would have "attained an education level of between 9th and 12th grade, and would have been employable in jobs requiring organizational and oversight skills[,]" but that, with deficits, the plaintiff would likely drop out of school by age sixteen, "would not complete a 9th grade education," and "would be employable [only] for 'very basic manual labor[.]'" Id. at 284-85, 771 A.2d at 469-70. Then, using general statistical data, Lieberman opined that the plaintiff's "earning capacity was less than what it would have been" absent deficits. Id. at 285, 771 A.2d at 470. The Court of Special Appeals stated that, despite the circumstance that the plaintiff

- 38 -

had no work history or track record of employment, the combination of evidence specific to [him] and general to the population that was adduced at trial was such as to permit a reasonable finding that, more likely than not, [the plaintiff]'s future earning would be less than it would have been if he were not injured.

Id. at 285, 771 A.2d at 470.

By contrast, in this case, Dr. Davis opined about Respondent's educational and vocational attainment with and without deficits, and did not calculate the loss of earning capacity that would result. Rather, the calculation of the loss of earning capacity was done by Dr. Lurito, who relied on general statistical data to arrive at the figures that he testified to. In short, the types of opinions offered by Lieberman in Lewin Realty were offered by two experts in this case—Dr. Davis and Dr. Lurito. In Lewin Realty, id. at 284-85, 771 A.2d at 469-70, the Court of Special Appeals did not state, or even imply, that Lieberman was required to rely on general statistical data in offering opinions as to the plaintiff's educational and vocational potential with and without deficits. Rather, it is clear that the reference to general statistical data concerned only Lieberman's determination or calculation that the plaintiff incurred a loss of earning capacity as a result of his injuries— not Lieberman's opinion as to the plaintiff's educational and vocational attainment absent deficits. See id. at 284-85, 771 A.2d at 469-70.

Nor does Sugarman establish a requirement that an expert must rely on general statistical data to support an opinion as to a plaintiff's educational and vocational attainment with and without deficits. Rather, in Sugarman, 460 Md. at 444-45, 190 A.3d at 372-73, it was the economic expert—not the vocational rehabilitation expert—who relied on general statistical data to quantify damages in the form of loss of earning capacity.

The circumstances in this case are almost identical to those in <u>Sugarman</u>, 460 Md. at 445-46, 190 A.3d at 372-73, in which this Court held that a vocational rehabilitation expert's and economic expert's combined testimony "set forth sufficient evidence of damages in the form of loss of earning capacity[.]"

In <u>Sugarman</u>, <u>id.</u> at 406, 437, 190 A.3d at 349-50, 368, Lieberman, a vocational rehabilitation expert, testified about his vocational assessment of the plaintiff and the various reports and records he reviewed, and ultimately opined that the plaintiff, with deficits, would not earn an associate's degree, but that, without deficits, he would have earned such a degree. Importantly, in reviewing whether Lieberman's opinion that, absent deficits, the plaintiff would have obtained an associate's degree, was supported by a sufficient factual basis, this Court determined that the "opinion was based on substantial material[.]" <u>Id.</u> at 444, 190 A.3d at 372. We explained that Lieberman had: interviewed the plaintiff; conducted vocational testing; reviewed the plaintiff's educational and medical records; reviewed and relied upon the neuropsychological evaluation and conclusions of Dr. Kraft, a neuropsychologist; and relied on his experience as a vocational rehabilitation counselor, including having assisted thousands of students attend college. <u>See id.</u> at 444, 190 A.3d at 372. This data formed the basis for Lieberman's opinions concerning the plaintiff's educational and vocational attainment with and without deficits. <u>See id.</u> at 444, 190 A.3d at 372. Then Dr. Conte, an economic expert, testified about the plaintiff's damages as a result of loss of earning capacity, *i.e.*, the difference between the financial earnings of a college graduate versus those of a non-college graduate, calculating a figure that represented that loss. <u>See id.</u> at 408-09, 190 A.3d at 350-51.

The same happened in this case with Dr. Davis's and Dr. Lurito's opinions. Like Lieberman, Dr. Davis conducted a detailed, individualized assessment of Respondent, reviewing various reports and records, and relied on that assessment and her expertise and experience as a vocational counselor in forming opinions regarding Respondent's educational and vocational attainment with and without deficits. Then, similar to Dr. Conte's process in Sugarman, id. at 408-09, 190 A.3d at 350-51, Dr. Lurito opined that Respondent had suffered a loss of earning capacity by relying on Dr. Davis's opinions, and he quantified the loss of earning capacity by relying on general statistical data. And, as we concluded in Sugarman, id. at 445, 190 A.3d at 372-73, this "combined information offered by" Dr. Davis and Dr. Lurito "presented a detailed and individualized analysis of [Respondent]'s employment prospects and future earnings[,]" and Respondent "set forth an individualized analysis of his likely outcome coupled with statistical data to assist the jury in quantifying his damages." In other words, Dr. Davis's testimony was supported by a sufficient factual basis.

In any event, at best, what can be gleaned from Lewin Realty and Sugarman is that the calculation of loss of earning capacity, *i.e.*, the calculation of damages, must be based on general statistical data. Notably, neither this Court nor the Court of Special Appeals held that an expert must take into account general statistical data when offering an opinion as to a plaintiff's educational and vocational attainment absent deficits. Rather, that opinion must be based on an individualized assessment of the plaintiff. See Sugarman, 460 Md. at 445, 190 A.3d at 373 (The plaintiff "set forth an individualized analysis of his likely outcome coupled with statistical data to assist the jury in quantifying his damages."); Lewin

Realty, 138 Md. App. at 284, 771 A.2d at 469 ("[T]he evidence of [the plaintiff]'s lost earning capacity was not premised solely on general statistical data. [] Lieberman's opinion rested on facts personal to [the plaintiff] as an individual."). Put plainly, an expert's opinion that an individual would have obtained a higher degree of education and a different, more-skilled type of employment absent deficits caused by injuries related to lead-based paint poisoning need not be based on general statistical data to be supported by a sufficient factual basis.

We reject Petitioners' contention that Dr. Davis's opinion lacked a sufficient factual basis because she failed to utilize a reliable methodology for analyzing data. Dr. Davis's vocational assessment of Respondent largely mirrors that conducted by Lieberman in Sugarman, 460 Md. at 444-45, 190 A.3d at 372-73, and we held in that case that Lieberman's testimony was supported by a sufficient factual basis. To be sure, in Sugarman, id. at 406-07, 190 A.3 at 350, Lieberman utilized the "RAPEL methodology" and "administered the Career Ability Placement Survey" in conducting his vocational assessment of the plaintiff. RAPEL, however, is simply an acronym given to stages or parts of a vocational rehabilitation analysis, and served as a guide for Lieberman in assessing the plaintiff in that case. See id. at 406-07, 190 A.3d at 350. Sugarman contains absolutely no indication whatsoever that a vocational rehabilitation expert must use the RAPEL methodology or the Career Ability Placement Survey in conducting a vocational assessment of a plaintiff. Additionally, we know of no case that requires an expert to use the RAPEL methodology or the Career Ability Placement Survey. Put simply, the circumstance that Dr. Davis did not testify to using the RAPEL methodology or the Career

- 42 -

Ability Placement Survey does not mean that her opinions were not supported by a sufficient factual basis. And, it certainly cannot be said, based on this record and Dr. Davis's testimony, that her opinion as to Respondent's educational and vocational attainment absent deficits amounted to mere conjecture and speculation.

In sum, Dr. Davis's opinion regarding Respondent's vocational and educational potential absent deficits was supported by a sufficient factual basis. Accordingly, Dr. Davis's testimony was admissible under Maryland Rule 5-702(3), and the circuit court did not abuse its discretion in admitting her testimony into evidence. Because Dr. Davis's opinion was supported by a sufficient factual basis, Dr. Lurito's opinion, which was based on Dr. Davis's opinion, also had a sufficient factual basis.

## II.

### The Parties' Contentions

Petitioners contend that the circuit court abused its discretion in "*sua sponte* amend[ing] the scheduling order solely to the benefit of [Respondent], and extend[ing his] expert designation deadline by over a year[.]" (Cleaned up). Petitioners argue that the circuit court's actions, as well as its denial of their "request to amend their own expert deadline, extend the discovery deadline[,] and postpone the trial[,]" constituted a violation of due process and fairness. (Cleaned up). Petitioners assert that they were not timely notified that Respondent was seeking over $1 million in economic damages. Petitioners maintain that, although Respondent designated economists and other experts, he failed to disclose Dr. Lurito's report prior to the discovery deadline.

According to Petitioners, the circuit court "failed to consider" appropriate factors in

determining "how to address the late-disclosed report of Dr. Lurito." Petitioners argue that they were prejudiced by the late filing of the report because they had not designated their own economic expert. Petitioners maintain that the circuit court's offer to permit them to depose Dr. Lurito during trial and to designate their own economic expert was meaningless, and that they were effectively precluded "from mounting the necessary defense [to] these newly introduced economic damages." Petitioners, therefore, request the same relief that they requested with respect to admissibility of Dr. Davis's testimony.

Respondent counters that the Court of Special Appeals correctly upheld the circuit court's rulings as to the scheduling order and admission of Dr. Lurito's testimony. Respondent points out that he designated Dr. Lurito as an expert well before the discovery deadline, and that Petitioners had the opportunity to depose Dr. Lurito in August 2014, after his report was produced and when other experts were deposed, but chose not to do so. Respondent argues that Petitioners have failed to show that they suffered prejudice from any delay in the disclosure of Dr. Lurito's report. And, Respondent asserts that any prejudice was "offset" by the circuit court's offer allowing Petitioners to take Dr. Lurito's deposition during trial and to call their own economic expert. Respondent observes that, in any event, Petitioners produced their own vocational rehabilitation expert, who testified that Respondent suffered no cognitive impairment and was able to go to college, get a decent job, and succeed, to counter Dr. Davis's and Dr. Lurito's opinions. Respondent contends that, even if Dr. Lurito's report were late, dismissal of a case or exclusion of evidence to support a claim are sanctions normally imposed only where a discovery violation is persistent, deliberate, and prejudicial to the party or the trial court, and,

according to Respondent, none of those elements existed in this case. Respondent, therefore, argues that the circuit court did not abuse its discretion with respect to admission of Dr. Lurito's testimony and report.

## Standard of Review

An appellate court reviews for abuse of discretion a trial court's decision to impose, or not impose, a sanction for a discovery violation. See Beka Indus., Inc. v. Worcester Cty. Bd. of Educ., 419 Md. 194, 232, 18 A.3d 890, 913 (2011). In exercising its discretion, the trial "court should weigh (1) the reasons why the disclosure was not made; (2) the existence and amount of any prejudice to the opposing party; (3) the feasibility of curing any prejudice; and (4) any other relevant circumstances." Id. at 232, 18 A.3d at 913 (cleaned up).

## Discovery Violations

In Lowery v. Smithsburg Emergency Med. Serv., 173 Md. App. 662, 678, 920 A.2d 546, 555 (2007), the Court of Special Appeals held that the trial court did not abuse its discretion in granting a motion *in limine* to exclude an expert's testimony for a discovery violation. In that case, the plaintiffs, a husband and wife, sued the husband's former employer and coworker for defamation, tortious interference with contract, and other claims. See id. at 666-68, 920 A.2d at 548-49. The trial court issued a scheduling order requiring that "all experts be named by August 6, 2005 and all discovery be completed by November 25, 2005." Id. at 668, 920 A.2d at 549 (footnote omitted). On March 24, 2005, in response to the defendants' interrogatories requesting disclosure of expert witnesses, the plaintiffs stated that they had "not yet retained any experts." Id. at 668, 920 A.2d at 549.

- 45 -

On August 5, 2005, the plaintiffs designated Dr. Richard Edelman "as an expert to render an opinion in regard to future lost wages[.]" Id. at 668, 920 A.2d at 549. On March 15, 2006, only twelve days before trial was to begin on March 27, 2006, the plaintiffs disclosed Dr. Edelman's report to the defendants. See id. at 669, 920 A.2d at 550. The defendants filed a motion *in limine* to exclude Dr. Edelman, and on March 23, 2006, the trial court granted the motion. See id. at 669, 920 A.2d at 550. On March 27, 2006, trial began; at the end of the plaintiffs' case-in-chief, the defendants moved for judgment, and the trial court granted the motion. See id. at 669, 920 A.2d at 550. The plaintiffs appealed. See id. at 669, 920 A.2d at 550.

The Court of Special Appeals determined that the trial court did not abuse its discretion in granting the defendants' motion *in limine* to exclude Dr. Edelman. See id. at 678, 920 A.2d at 555. The Court of Special Appeals explained that, "[i]n applying sanctions for discovery violations, a large measure of discretion is entrusted to the trial court." Id. at 674, 920 A.2d at 553. The Court of Special Appeals also explained that "[t]he determination by a trial court as to when discovery should be concluded ordinarily rests in the exercise of its sound discretion[,]" and that a "trial court has broad discretion in fashioning a remedy for the violation of discovery rules." Id. at 678, 920 A.2d at 555. The Court of Special Appeals, after reviewing factors relevant to a trial court's exercise of discretion in remedying a discovery violation, ultimately stated that it could not "conclude that the trial court abused its discretion when it determined that a balance of these factors favored the exclusion of [the plaintiff]s' expert." Id. at 678, 920 A.2d at 555.

**Analysis**

Here, we hold that the circuit court did not abuse its discretion in denying Petitioners' motion *in limine* with respect to Dr. Lurito's testimony and report and in admitting Dr. Lurito's testimony at trial. Under the circumstances of this case, we cannot say that the circuit court abused its discretion in denying the motion *in limine* to exclude Dr. Lurito's report and testimony on the ground that the report was untimely disclosed. On January 30, 2013, the circuit court issued a scheduling order, providing that discovery was to be completed by May 10, 2014. Respondent was to respond to all interrogatory requests concerning experts' findings and opinions by August 7, 2013, and depositions of expert witnesses were to be completed no later than May 10, 2014. In a letter to Petitioners' counsel dated May 9, 2013, Respondent's counsel designated various expert witnesses, including Dr. Lurito. As to Dr. Lurito, Respondent's counsel stated that Dr. Lurito was "expected to render an opinion regarding the loss of future earning capacity [Respondent] has suffered as a result of the injuries due to lead poisoning." Respondent's counsel further stated that Dr. Lurito would "quantify, in a present dollar amount, how much of an economic loss [Respondent was] expected to suffer over [his] expected lifetime." In an answer to an interrogatory, Respondent again identified various expert witnesses, including Dr. Lurito. In short, Respondent designated Dr. Lurito as an expert witness within the deadlines established by the scheduling order.

In July 2014, after the discovery deadline, Dr. Lurito prepared a report, opining that, absent deficits, Respondent's earning capacity was $2,862,509 in present value terms, and that, with deficits, Respondent's earning capacity was either $1,714,201 (if Respondent

controlled his anger) or $1,186,732 (if Respondent could not control his anger). As such, Dr. Lurito opined that Respondent "ha[d] likely suffered an income loss of $1,148,308 or $1,675,777 due to his cognitive deficits ($2,862,509 - $1,714,201[,] or $1,186,732)." In a letter to Petitioners' counsel dated July 29, 2014, that was mailed and faxed, Respondent's counsel stated that he had enclosed Dr. Lurito's report. According to Petitioners' counsel, they received Dr. Lurito's report on August 4, 2014. Over three weeks later, on August 28, 2014, Petitioners filed a motion *in limine* to exclude Dr. Lurito's letter and testimony as untimely. Curiously, Petitioners took no issue with the timeliness of the disclosure of Dr. Davis's letter, which was dated July 9, 2014, and provided to Petitioners thereafter, which was obviously after the discovery deadline of May 10, 2014, and on August 15, 2014, Dr. Davis was deposed.

On the first day of trial, September 15, 2014, the circuit court heard argument on the motion *in limine*, and denied the motion, as well as a request for postponement. The circuit court ruled that it was not going to deny Respondent "use of the expert when, under the circumstances, it was listed and noted far before the date that we're referring to." The circuit court stated that, in its view, the late disclosure was not intentional, and remarked that it was "not unusual where there becomes [] confusion as to is there a report; is this the latest report; and I did not receive it" after an expert is designated. The circuit court observed that, although Petitioners received Dr. Lurito's report weeks before trial, Dr. Lurito was listed on Respondent's expert designation, and Petitioners had failed to take any action either to depose Dr. Lurito or to promptly request a postponement after they received his report on August 4, 2014. Specifically, the circuit court explained: "The fact

that there was a report received, and no action from your office, based on the report, the request for postponement should have been filed then." The circuit court stated that "no action was taken to resolve the discovery problem[,]" and no action was taken suggesting that Petitioners were doing "everything [they] could to go forward on th[e] issue." The circuit court stated that, because Dr. Lurito had been designated as an expert well in advance of trial, "[t]his [was] not a type of case that [Petitioners] did not know where it was going. That even under the circumstances [they] could have and should have noted one of [their] own, period, a long time ago[.]" Nevertheless, the circuit court offered to permit Petitioners to take the deposition of Dr. Lurito that day and to designate an economic expert of their own.

Reviewing the circuit court's ruling, under the circumstances of the case, as the Court of Special Appeals concluded, we, too, "cannot say [that] the [circuit] court's action was a clear abuse of discretion." Dackman, 2018 WL 4190963, at *20. Indeed, the record demonstrates that, in exercising discretion to address the discovery violation, the circuit court properly weighed the reasons for the late disclosure, the existence of prejudice to Petitioners, the feasibility of curing any prejudice, and other relevant circumstances. See Beka Indus., 419 Md. at 232, 18 A.3d at 913. As such, we will not reweigh the factors and second-guess the circuit court's ruling where the record does not reveal that the circuit court exercised its discretion in a manner that was "manifestly unreasonable, or [] on

untenable grounds, or for untenable reasons." Levitas, 454 Md. at 243, 164 A.3d at 234.[10]

We find Petitioners' reliance on Lowery unavailing. To be sure, the circumstances in Lowery are superficially similar to those in this case to the extent that, as in Lowery, 173 Md. App. at 668-69, 920 A.2d at 549-50, a party disclosed an expert's report after the discovery deadline and the opposing party filed a motion *in limine* to exclude the expert. This case, however, is factually distinguishable from Lowery. In Lowery, id. at 669, 920 A.2d at 550, the expert's report was disclosed to the defendants only twelve days before trial was to start. By contrast, here, Dr. Lurito's report was disclosed by August 4, 2014, six weeks before trial was to start on September 15, 2014, and weeks before multiple depositions of expert witnesses occurred in mid-August, 2014. And, in Lowery, id. at 669, 920 A.2d at 550, the defendants promptly filed a motion *in limine* to exclude the expert, whereas, in this case, as the circuit court noted, Petitioners waited over three weeks before

---

[10]As to any prejudice, setting aside whether the issue of prejudice is preserved for appellate review, we conclude that Petitioners did not demonstrate that they were prejudiced by the late disclosure of Dr. Lurito's report. In addressing the motion *in limine*, the circuit court observed that, although Dr. Lurito's report was late, Petitioners received the report by August 4, 2014, six weeks before trial began, and thus, any issue was "resolvable." The circuit court further observed that Petitioners failed to take prompt action to resolve the issue or request a postponement. Essentially, the circuit court found that, because Petitioners had not taken action to resolve the discovery issue—either by scheduling Dr. Lurito's deposition, designating their own economic expert, or promptly requesting a postponement—Petitioners' claim of prejudice was an empty one. We agree, and we observe that the circuit court offered Petitioners two solutions to remedy any possible prejudice—namely, the opportunity to take Dr. Lurito's deposition and to designate their own economic expert. And, at trial, Petitioners cross-examined Dr. Lurito and presented their own experts, who opined, among other things, that Respondent is not cognitively impaired, "has the capability to go to college" and "maintain[] gainful employment in a semi-skilled to skilled job[,]" and "will not experience an earning capacity loss . . . or a reduced work-life expectancy[.]" In other words, at trial, Petitioners presented competing expert testimony to contradict the opinions of both Dr. Davis and Dr. Lurito.

taking any action with respect to Dr. Lurito's report and filing the motion *in limine* to exclude Dr. Lurito's report and testimony as untimely.

In any event, <u>Lowery</u>, <u>id.</u> at 678, 920 A.2d at 555, stands for the principle that addressing a discovery violation and imposing a sanction for such a violation are matters wholly within the trial court's discretion, and appellate review is limited to determining whether an abuse of that discretion occurred.  Because the trial court in <u>Lowery</u> granted a motion *in limine* and excluded the expert does not mean that the same result was required in this case.  Contrary to Petitioners' contentions, we do not discern a clear abuse of discretion on the circuit court's part in denying the motion *in limine* and admitting Dr. Lurito's report and testimony.

In sum, we hold that the circuit court did not abuse its discretion in denying the motion *in limine* to exclude Dr. Lurito's report and testimony as untimely.  Under the circumstances of this case, the circuit court did not abuse its discretion in admitting Dr. Lurito's report and testimony at trial.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  PETITIONERS TO PAY COSTS.**